STATE of Missouri, Respondent,

v.

Antonio RICHARDSON, Appellant.

No. 76059.

Supreme Court of Missouri,
En Banc.

May 28, 1996.

Rehearing Denied June 25, 1996.

Craig A. Johnston, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, John M. Morris, Assistant Attorney General, Jefferson City, for Respondent.

COVINGTON, Judge.

Antonio D. Richardson was convicted by a jury of murder in the first degree, section 565.020, RSMo 1986, and murder in the second degree, section 565.021, RSMo 1986. The trial court fixed punishment at death for the conviction of murder in the first degree and life imprisonment for the conviction of murder in the second degree. The postconviction court overruled appellant's Rule 29.15 motion. The judgments are affirmed.

## THE CASE

The evidence is viewed in the light most favorable to the verdict. *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995). Twenty-year-old Julie Kerry and her nineteen-year-old sister, Robin, took their nineteen-year-old cousin, Thomas Cummins, to the Chain of Rocks Bridge in St. Louis on the night of April 4, 1991. The sisters wanted to show Cummins a poem they had painted on the deck of the abandoned bridge connecting Missouri and Illinois across the Mississippi River.

Earlier that evening, appellant Antonio Richardson, Marlin Gray, Reginald Clemons, and Daniel Winfrey went to the home of a mutual friend in St. Louis where they drank beer, smoked marijuana, and watched television. Antonio Richardson was a sixteen-year-old juvenile. At Gray's suggestion, the group went to the Chain of Rocks Bridge to smoke more marijuana. When the marijuana would not light, the group started back toward their cars, inadvertently leaving a flashlight that had been brought to the bridge by appellant.

After the Kerry sisters and Cummins arrived, they walked toward the Illinois side of the bridge, where they encountered appellant and his associates returning to the Missouri side of the bridge. The two groups exchanged pleasantries and talked for a short time. Gray showed Cummins and the Kerrys how to climb down a manhole on the deck of the bridge to a metal platform that leads to a concrete pier supporting the bridge.

Gray told Cummins the platform was a good place to be "alone with your woman." When the two groups separated, the Kerrys and Cummins continued to walk eastward toward Illinois.

While appellant and his friends walked toward the Missouri side of the bridge, Clemons suggested that they rob the Kerrys and Cummins. Gray replied, "Yeah, I feel like hurting somebody." The group turned around and walked in the direction where they had last seen their intended victims. When Gray handed Winfrey a condom, Winfrey responded to the implication by saying he "wasn't going to do it." Gray and Clemons pushed Winfrey against the bridge railing and threatened him until Winfrey agreed to "do it."

Appellant's group continued to walk toward the Illinois side of the bridge and eventually came upon the Kerrys and Cummins. Appellant went to the side of the bridge and yelled something to some campers on the river bank below. At that point, the Kerrys and Cummins began walking back toward the Missouri side of the bridge. Appellant and his friends followed them back.

As the groups passed a bend in the bridge, Gray put his arm around Cummins, walked him back a short distance, and told him, "[T]his [is] a robbery. Get down on the ground." Cummins immediately complied. At that time, appellant, Clemons and Winfrey grabbed Julie and Robin Kerry. One of the three told the girls to stop screaming or they would be thrown off the bridge. Appellant held the first sister's shoulders down while Clemons ripped off her clothing and raped her. Appellant then raped the first sister while Clemons held her down. Winfrey held the second sister on the ground and covered her face with her coat. At some point, one of the assailants told Cummins that he had "never had the privilege of popping anybody," and that Cummins would be shot if he looked up. Gray then told Winfrey to watch Cummins, which he did. Gray and Clemons tore off the second sister's clothes and each raped her.

Appellant forced the first sister into the manhole and followed her while Gray raped

the second sister. When Gray had finished raping the second sister, he asked Winfrey, who was still watching Cummins, where appellant had gone. Winfrey pointed to the Missouri side of the river. Gray then ran off toward the Missouri side in search of appellant and the first sister. Clemons, after completing his rape of the second sister, forced her down the same manhole through which appellant had taken the first sister. Clemons then robbed Cummins, forcing him to surrender his wallet, wristwatch, cash and keys. Clemons forced Cummins to get up and, while holding Cummins' head down so he could not see Clemons, walked Cummins a short distance on the bridge and made him lie down again. Cummins heard two of the assailants discussing whether he would live or die. Clemons then forced Cummins down the manhole and followed him. Winfrey went toward the entrance of the bridge to find Gray.

Under the bridge, the Kerrys and Cummins were told to step out onto the concrete pier below the metal platform. The three were told not to touch each other. Julie and Robin Kerry were pushed from the pier, falling a distance of approximately seventy feet. Cummins was told to jump. Believing his chances of survival were better if he jumped instead of being pushed, Cummins jumped from the bridge.

When Cummins came to the surface in the strong current of the Mississippi River, he saw Julie Kerry nearby in the water and called for her to swim. The current brought them near to one another and Julie Kerry grabbed Cummins. Cummins broke free after he started to drown. Cummins did not see Julie Kerry again.

Appellant and Clemons met Winfrey and Gray near the entrance to the bridge. Clemons said, "We pushed them off. Let's go." The group ran to their cars, drove to a gas station in Alton, Illinois, and bought a sandwich and cigarettes. The group then drove to an observation point over the Mississippi River called the Chair, where they sat and watched the river. Gray and Clemons remarked that the victims would "never make it back to shore." Gray told Clemons that appellant was "brave" to push the Kerry

sisters off the bridge. Gray told Winfrey that he "should have got some of the pussy."

Julie Kerry's body was found three weeks after the crimes in the Mississippi River by the sheriff of Pemiscot County, Missouri. The body of Robin Kerry was never recovered. Cummins survived and testified at appellant's trial.

In the penalty phase of the trial, the state introduced victim impact evidence and testimony concerning appellant's attempt to threaten a witness for the state during the guilt phase of the trial. Appellant presented witnesses in mitigation including four relatives, who testified about his childhood, and a social worker, who described appellant's low score on I.Q. tests. The jury returned a form of verdict stating that it was unable to agree on punishment. As provided under section 565.030.4(4), RSMo 1986, the trial court entered judgment. The court imposed a sentence of death, finding that the evidence established the following statutory aggravating circumstances: that the murder of Julie Kerry was committed while appellant was engaged in the commission of the unlawful homicide of Robin Kerry, section 565.032.2(2); that the murder was committed while appellant was engaged in the attempted commission of the unlawful homicide of Thomas Cummins, section 565.032.2(2); that appellant committed the murder while knowingly aiding or encouraging Gray and Clemons in the perpetration of rape and attempted robbery, section 565.032.2(4); that the murder was outrageously or wantonly vile, horrible or inhuman, section 565.032.2(7); and that appellant committed the murder for the purpose of avoiding his lawful arrest or that of Gray or Clemons, section 565.032.2(10).

## VOIR DIRE

 Appellant contends that the trial court abused its discretion in sustaining the state's challenges for cause of thirteen venirepersons. The Sixth and Fourteenth Amendments to the United States Constitution, which guarantee an impartial jury, prohibit the exclusion of venirepersons "simply because they voiced general objections to the death penalty or expressed conscientious or

religious scruples against its infliction." *Gray v. Mississippi,* 481 U.S. 648, 657, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987) (quoting *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968)). Only those jurors "irrevocably committed ... to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings" are properly excluded from the panel. *Gray,* 481 U.S. at 657–58, 107 S.Ct. at 2051 (quoting *Witherspoon,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21). The standard for determining when a prospective juror may be excluded for cause because of his or her views on the death penalty is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).[1] The trial court has broad discretion in determining the qualifications of prospective jurors; its ruling on a challenge for cause will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion. *State v. McMillin,* 783 S.W.2d 82, 91 (Mo. banc 1990). Venirepersons may properly be excused if their views would preclude following instructions given by the court, including the inability to follow instructions regarding the burden of proof. *State v. Gray,* 887 S.W.2d 369, 383 (Mo. banc 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995); § 494.470.2, RSMo 1994.

■ The record reflects that nine venirepersons, Benson, Edwards, Fowler, Shirley Jackson, Audrey Johnson, Angela Jones, Rodebaugh, Vickers, and Watson, indicated during voir dire that they would require a higher burden of proof than reasonable doubt to impose the death penalty, even if the court instructed them differently. The trial court did not abuse its discretion in concluding that the venirepersons at issue were at least "substantially impaired" in their ability to follow the law regarding the burden of proof. *See Wainwright,* 469 U.S. at 424, 105 S.Ct. at 852; *Gray,* 887 S.W.2d at 382–83.

■ Appellant claims that the disqualifications of venirepersons who stated they would be unable to consider the death penalty based on accomplice liability and appellant's age were improper because these factors are legitimate statutory mitigators. *See* §§ 565.032.2(4) & (7). Venirepersons Cannon, Hughes and Pisoni each indicated that he or she would be unable to impose a sentence of death if the state did not prove that appellant pushed the Kerry sisters from the bridge. Venirepersons Edwards and Fowler also stated that they would be unable to impose the death penalty on an accomplice who did not push the victims. Venireperson O'Brien stated that she could not consider the death penalty "having seen the defendant, having—knowing his approximate age." Appellant confuses the consideration of mitigating circumstances, which jurors are required to consider before rendering a verdict, with a refusal before trial to consider the full range of punishment, which is a ground for disqualification. *See Penry v. Lynaugh,* 492 U.S. 302, 317–18, 109 S.Ct. 2934, 2946–47, 106 L.Ed.2d 256 (1989); § 494.470.2; *see also State v. Gray,* 887 S.W.2d at 381–83. Appellant's additional contention, that the prosecutor's questions improperly sought to obtain from the prospective jurors a commitment to act in a certain way, is also meritless. *See State v. Antwine,* 743 S.W.2d 51, 58–59 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). The prosecutor merely sought to elicit responses from the venirepersons on the issue of whether they could follow the law. *See*

---

1. Appellant misstates the standard for whether a venireperson was properly excluded for his or her views on the death penalty to require a showing that it be "unmistakably clear" that the venireperson's views would *automatically* cause them to vote against the death penalty. *See Witherspoon,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21. *Wainwright* explicitly rejected the language upon which appellant relies and clarified the standard. *See id.* at 524, 88 S.Ct. at 1778. *Granviel v. Estelle,* 655 F.2d 673, 677–78 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982), and *Burns v. Estelle,* 626 F.2d 396, 397–98 (5th Cir.1980), are of no assistance to appellant. Both cases used the standard of review rejected in *Wainwright,* and involved more equivocal responses than those given by the excused venirepersons in the case before this Court.

*Gray,* 887 S.W.2d at 381–83 (upholding the use of questions nearly identical to those used here). The trial court did not abuse its discretion in sustaining the state's challenge for cause of venirepersons Cannon, Hughes, Pisoni and O'Brien, each of whom stated that he or she would be unable to consider the death penalty under the circumstances of the case before them.

■ Appellant next contends that the trial court abused its discretion in denying his challenges for cause as to venirepersons Puleo and Rode, who stated that they favored the death penalty. Puleo ultimately stated that he could be "completely neutral" despite his personal feelings, and Rode repeatedly stated that she would follow the law. Appellant used peremptory strikes to remove the two venirepersons. Appellant contends that the trial court's ruling violated his right to a full panel of qualified jurors before he must expend peremptory challenges, and also violated the rule, valid at the time of trial, that prejudicial error results from a failure to sustain a meritorious challenge for cause. *See State v. Wacaser,* 794 S.W.2d 190, 193 (Mo. banc 1990).

In *State v. Gray,* 887 S.W.2d at 383, this Court made clear that the right to a list of qualified jurors from which to make peremptory strikes is statutory. *See also State v. Schnick,* 819 S.W.2d 330, 334 (Mo. banc 1991). The relevant statute was amended in 1993. It currently provides that a potential juror's qualifications do not constitute grounds for a new trial or reversal if the juror was removed by a peremptory strike and did not serve. § 494.480.4, RSMo Supp. 1993. Puleo and Rode did not serve as jurors; therefore, the trial court did not commit reversible error in overruling appellant's motion to strike the two venirepersons for cause.

Appellant claims that section 494.480.4 is not "a firmly established and regularly followed" state practice that can prevent sub-stantive review of his challenge to the trial court's ruling on the merits because it has not been applied consistently in other cases to preclude review.[2] *See Ford v. Georgia,* 498 U.S. 411, 424, 111 S.Ct. 850, 857–58, 112 L.Ed.2d 935 (1991). In *Ford,* the United States Supreme Court held that only a state practice that is "firmly established and regularly followed" at the time at which it is to be applied may be interposed to prevent subsequent review of a federal constitutional claim. *Id.* at 424, 111 S.Ct. at 857–58. *Ford* is of no assistance to appellant because the claim he attempts to raise, as noted above, rests on statutory, not constitutional, grounds. This Court need not review the merits of appellant's claim.

■ Appellant's contention that the application of the new statute to his case would constitute an ex post facto violation is also incorrect. Section 494.480.4, RSMo Supp. 1993, is procedural in nature and became effective prior to the final disposition of this appeal. There is no violation of the prohibition against ex post facto laws. *Gray,* 887 S.W.2d at 383 (citing *State v. Wings,* 867 S.W.2d 607, 608–09 (Mo.App.1993)).

## GUILT PHASE

■ Appellant claims that the trial court erred in denying his request to obtain and present at trial the prior juvenile record of Daniel Winfrey. *See* Rule 30.20. Winfrey, a fifteen-year-old participant in the crimes against the Kerrys and Cummins, was one of the principal witnesses against appellant. The court certified him for trial as an adult. In exchange for his testimony Winfrey was permitted to plead guilty to two counts of second degree murder and other charges for which he would receive sentences totalling thirty years imprisonment. Winfrey was not a witness to the murder of the Kerry sisters. At appellant's trial, Winfrey described the

**2.** This Court has reviewed for-cause challenges similar to the ones raised by appellant where the accused later removed the venirepersons at issue with peremptory challenges. *State v. Parker,* 886 S.W.2d 908, 919–20 (Mo. banc 1994), *cert. denied,* — U.S. —, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995); *State v. Wise,* 879 S.W.2d 494, 511– 12 & n. 9 (Mo. banc 1994), *cert. denied,* — U.S. —, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995) (specifically noting amendment to section 494.480.4); *State v. Harris,* 870 S.W.2d 798, 806 (Mo. banc), *cert. denied,* — U.S. —, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994).

rape and robbery of the victims and events before and after the crimes.

On cross-examination, the defense sought to impeach Winfrey with his plea agreement. Afterwards, with consent of defense counsel, Winfrey was finally excused. The following day, counsel requested that the court obtain Winfrey's juvenile records from St. Charles County so that appellant could use the records to impeach Winfrey's cross-examination testimony that he "had never been in trouble before." The statement made by Winfrey was not made in direct response to a question about whether he had been in trouble; rather, the question and answer at issue were "Q. [by defense counsel]: And did you not understand at that time [when Winfrey confessed to the crime] what a deputy juvenile officer, who that was? A.: I had never been in trouble before. I really didn't know who he was, no." In support of his motion appellant cited *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The court denied appellant's request but ultimately obtained information by telephone on the records from St. Charles County. The court ruled that Winfrey's prior juvenile referrals were inadmissible under Missouri law and that appellant had no constitutional right to the presentation of the evidence. The court ordered that two references made during the discussion of specifics of Winfrey's juvenile record be deleted from the transcript on appeal.

The state asserts that appellant's request for Winfrey's juvenile records was untimely. Whether under plain error review or otherwise, appellant's claim lacks merit. Section 211.271.3, RSMo 1994, provides that the reports and records of the juvenile court are not lawful or proper evidence against the juvenile "and shall not be used for any purpose whatsoever in any proceeding, civil or criminal...." The juvenile protection statute is "mandatory" and "all-inclusive," and yields only to the extent required by the Sixth Amendment to the United States Constitution. *State v. Miner,* 657 S.W.2d 332, 333 (Mo.App.1983). *Davis* carved out a constitutional exception to the general statutory rule. The right to confrontation requires the admission of juvenile records against a witness only as they pertain to the existence of a possible bias or prejudice. *Davis,* 415 U.S. at 316–17, 94 S.Ct. at 1110–11. *Davis* permits impeachment for bias where the witness has a motive to lie because he is subject to the control of the juvenile authorities. *Id.* at 317–18, 94 S.Ct. at 1110–11.

Appellant fails to distinguish between the use of juvenile records for impeachment for bias and impeachment on general credibility. Appellant's only claim at trial was that Winfrey's statement that he "had never been in trouble before" had "open[ed] the door to ... prior juvenile arrests and prior juvenile criminal actions...." Defense counsel sought to show that Winfrey had been untruthful when he said he had not been in trouble in the past, an attack on Winfrey's general credibility as a witness. Appellant's claim is not within the scope of the holding in *Davis.* *See State v. Russell,* 625 S.W.2d 138, 141–42 (Mo. banc 1981); *State v. Foster,* 854 S.W.2d 1, 8 (Mo.App.1993); *State v. Shaw,* 839 S.W.2d 30, 33–34 (Mo.App.1992); *State v. Wilson,* 755 S.W.2d 707, 711 (Mo.App.1988).[3]

Because appellant's stated ground for obtaining and presenting the juvenile record at trial is without merit as a matter of law, this Court need not consider appellant's related point that the omission of the specific contents of Winfrey's record left an insufficient transcript for appeal. The point is denied.

■ Appellant claims that the trial court erred in its admission of testimony and various items of evidence that appellant contends were inadmissible hearsay. A hearsay statement is any out-of-court statement offered to prove the truth of the matter asserted. *State v. Chambers,* 891 S.W.2d 93, 102 (Mo. banc 1994). In matters involving the admission of evidence, the Court reviews for prejudice and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. McMillin,* 783 S.W.2d 82, 98 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990).

**3.** Appellant attempts to supplement his citation of authority with *State v. Collier,* 892 S.W.2d 686, 692–93 (Mo.App.1994), without argument. This Court need not address citations submitted without supporting argument. *See Leahy v. Leahy,* 858 S.W.2d 221, 228 (Mo. banc 1993).

Appellant challenges the admission of a statement made by codefendant Gray, who did not testify at trial. Winfrey testified over objection that Gray told Clemons appellant was "brave for doing that," meaning pushing the Kerry sisters from the bridge. The statement was made in appellant's presence on the night of the crimes as the four codefendants sat at the Chair overlooking the Mississippi River. Appellant claims that the admission of the out-of-court statement of a codefendant not available for cross-examination violates his right to cross-examination secured by the Confrontation Clause of the Sixth Amendment. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Appellant contends further that the statement is inadmissible hearsay.

The state contends that *Bruton* does not apply. The state also contends that the statement was not hearsay because it was not offered to establish the truth of its contents. *See Chambers*, 891 S.W.2d at 103–04. Alternatively, the state argues that the statement is admissible as an exception to the hearsay rule because it constitutes a tacit admission. *See State v. Samuel*, 521 S.W.2d 374, 375 (Mo. banc 1975); *State v. Gibbs*, 875 S.W.2d 159, 161 (Mo.App.1994).

This Court need not determine whether Gray's out-of-court statement directed toward Clemons constituted a tacit admission, nor determine whether it was hearsay; the statement did not prejudice appellant because, without the statement, the evidence of guilt is strong. *See State v. Cook*, 628 S.W.2d 657, 661 (Mo. banc 1982). To establish guilt the instructions required the jury to find that either appellant or Clemons pushed the sisters from the bridge. Direct testimony of Winfrey was that appellant forced one of the Kerry sisters down the manhole, followed her beneath the bridge, and remained there with her. Winfrey's story was corroborated by Tom Cummins, who testified that appellant was under the bridge when the sisters were pushed. Cummins testified that he recognized appellant's voice telling the cousins to "stop touching each other" under the bridge and ordering Cummins to jump. Winfrey testified further that appellant and Clemons met Winfrey and Gray near the bridge entrance after the murders, and that Clemons said, "We pushed them off. Let's go." Notwithstanding Gray's statement, therefore, the evidence that appellant and Clemons were under the bridge at the time of the murders and that one of them pushed the Kerry sisters was strong. *See Cook*, 628 S.W.2d at 661–62. The strength of the state's case convinces this Court that the jury's verdict would have been no different if Gray's out-of-court statement had been excluded. *See State v. Miller*, 821 S.W.2d 553, 556 (Mo.App.1991). The trial court did not commit prejudicial error by allowing the admission of Gray's out-of-court statement. For the same reason, there is no *Bruton* violation, assuming, *arguendo*, that *Bruton* is applicable. *See Bruton*, 391 U.S. at 135–37, 88 S.Ct. at 1627–29.

Appellant alleges that the trial court erred in admitting certain testimony and physical evidence during the direct examination of Detective Brauer, a police officer who investigated the murders. Brauer testified regarding procedures and events that occurred during his investigation. Brauer stated that while investigating the ownership of the flashlight found on the bridge, he initially questioned appellant and released him to the custody of his mother. Brauer testified that he subsequently interviewed Gray and Clemons and took tape-recorded statements from both; Gray and Clemons were arrested on the evening of April 7, 1991, after making their statements. Brauer then testified as follows:

Q: Were you aware of whether or not an individual by the name of Daniel Winfrey was taken into custody on that Monday [April 8, 1991]?

A: I don't recall, sir.

Q: By your unit.

A: By the unit, not by me.

Q: Okay. I didn't say you, I mean into custody by your unit. Now, at approximately 5 p.m., 5:30 p.m. on April 8, 1991, did you take into custody and arrest Antonio Richardson?

A: Yes, I did.

Q: And for the offenses which you were investigating?

A: Correct.

The trial court admitted into evidence the recordings and transcripts of the statements, but they were never played, read, or otherwise made available to the jury. The court also admitted into evidence photographs of the Kerry sisters and the flashlight found on the bridge, all of which Gray and Clemons had signed on the back, but directed the prosecutor not to call the jury's attention to the signatures when the time came for closing argument.

Again citing *Bruton*, as well as *State v. Valentine*, 587 S.W.2d 859 (Mo. banc 1979), appellant contends that the testimony and physical evidence injected an impermissible hearsay inference that Winfrey, Gray and Clemons had implicated appellant in their statements made to police. Appellant does not explain how he suffered prejudice, perhaps because his theory of defense conceded that he was present at the crime scene and participated in the rapes and robberies. *See State v. Grubbs*, 724 S.W.2d 494, 501 (Mo. banc), *cert. denied*, 482 U.S. 931, 107 S.Ct. 3220, 96 L.Ed.2d 707 (1987); *State v. Hunter*, 622 S.W.2d 374, 379 (Mo.App.1981), *vacated on other grounds*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). He had already been questioned by police before Gray and Clemons made statements. Independent sources of evidence, including the identification by Cummins and the testimony of Winfrey, connected appellant with the crimes, and, as noted above, evidence of guilt was strong. The trial court did not commit prejudicial error in admitting the evidence.

■ Appellant also fails to demonstrate prejudice in the admission of several other out-of-court statements of which he complains. Winfrey testified that, while sitting at the Chair on the night of the rapes and murders, Gray and Clemons both said, regarding the victims, "they'd never make it back to shore," and that Gray told Winfrey he "should have got some of the pussy." Two of Gray's friends testified that Gray showed them the watch stolen from Tom Cummins and told them that he had gotten it in a fight. Another witness testified that when viewing a news broadcast reporting the murders of the Kerry sisters, Gray and Clemons both said, "I did that." Winfrey's girlfriend testified that Winfrey told her on the day after the crimes that he and Gray and others had been at the bridge and had raped and murdered the victims, and that Gray had raped one of the girls while Winfrey held her down. The statements did not prejudice appellant. *See McMillin*, 783 S.W.2d at 98. None of the challenged statements was inconsistent with appellant's theory of defense because the statements did not directly implicate appellant in the murders. The result would not have been different if the statements had been excluded. *See Miller*, 821 S.W.2d at 556.

The trial court did not commit reversible error in its admission of the challenged out-of-court statements. The point is denied.

■ Appellant contends that the trial court plainly erred in failing *sua sponte* to declare a mistrial after the prosecutor allegedly commented on appellant's failure to testify during closing argument in the guilt phase of the trial. Appellant claims that the prosecutor's remarks violated his right against self-incrimination under the Fifth Amendment of the United States Constitution and the Missouri Constitution, art. I, § 19.

Appellant complains of several remarks by the prosecutor during guilt-phase closing argument in which he referred to evidence of appellant's guilt as being "uncontradicted" and "undisputed." Appellant also complains of the emphasized portion of the following argument:

Now, let's talk about to a certain degree what Mr. Richardson's level of participation is here. The people saw Thomas Cummins, Julie Kerry and Robin Kerry, and apparently it evoked some response from them. Not, "Those were nice-looking young girls. He was a good fellow. Hmm. Let's go on and have another beer, go someplace else." What response uniformly among all of them it evoked was, "They're nice-looking girls. Let's go get them. Let's rob them." And not one of those young men had the chutzpa, had the

**314**

courage to say no. Not one of them. And I include Mr. Winfrey in that.

When it is discussed at the end of the bridge, when it is easiest for all to part company, Reggie—or Tony or Anthony, Mr. Richardson is there. And it is said, "Let's rob them." *Did you hear him [appellant] say from the testimony here,* I don't think that's such a good idea. That's against the law. It's certainly against my principles and certainly is not a nice thing to do." Did you hear any of the young men say that? (Emphasis added)

▮▮▮ The trial court has wide discretion in controlling the scope of closing argument. *State v. Lee,* 841 S.W.2d 648, 653 (Mo. banc 1992). The trial court is able to observe the contested incidents and to determine their prejudicial effect, if any, on the jury. *Id.* The prosecutor may not comment adversely on the defendant's failure to testify. *State v. Arnold,* 628 S.W.2d 665, 668 (Mo. 1982), *vacated on other grounds sub. nom., Missouri v. Kane,* 459 U.S. 1193, 103 S.Ct. 1172, 75 L.Ed.2d 424 (1983). The prosecutor may not directly use words such as "defendant," "accused" and "testify" or their equivalent, nor may the prosecutor make indirect comments that clearly imply reference to defendant's failure to testify. *Arnold,* 628 S.W.2d at 668–69; *see also State v. Buzzard,* 909 S.W.2d 370, 373 (Mo.App.1995). Although a direct reference to the failure of the defendant to testify will generally require reversal of the conviction, an indirect reference is improper only if the prosecutor demonstrates a calculated intent to magnify the defendant's decision not to testify so as to call it to the jury's attention. *State v. Lawhorn,* 762 S.W.2d 820, 826 (Mo. banc 1988).

Merely stating that the evidence is "uncontradicted" or "undisputed," or that a defendant has failed to offer evidence is not a direct reference to a defendant's failure to testify. *Lee,* 841 S.W.2d at 653. The prosecutor's remarks that the evidence was "uncontradicted" or "undisputed" did not, therefore, refer directly to appellant's silence. Appellant nevertheless contends that the prosecutor's statements labelling certain evidence as "uncontradicted" were impermissible because the evidence could have been contradicted only by him. *See State v. Robinson,* 184 S.W.2d 1017, 1018 (Mo.1945). Appellant is incorrect. Appellant was not the only witness who could have disputed the evidence characterized as "uncontradicted;" in fact, defense counsel attempted to contradict the evidence, which came from two eyewitnesses, by presenting allegedly inconsistent prior statements by the witnesses during cross-examination.

▮▮▮ Appellant also challenges the statement, "Did you hear him [appellant] say from the testimony here...." Viewed in the context in which the statement was made, it was not a direct reference to appellant's failure to testify; rather, it was a proper reference to Winfrey's testimony that appellant and the other codefendants did not object to the crimes prior to their commission. *Compare State v. Katura,* 837 S.W.2d 547 (Mo.App. 1992); *State v. Jones,* 747 S.W.2d 229, 233–34 (Mo.App.1988).

In sum, none of the challenged statements was an improper indirect reference because there is no indication of an intent by the prosecutor to call the jury's attention to the fact that appellant did not testify. The challenged arguments merely commented on the relative weakness of appellant's case. The trial court did not plainly err in failing *sua sponte* to declare a mistrial.

Appellant claims the trial court plainly erred in sustaining in part the state's motion in limine, which sought to prevent defense counsel from making certain guilt-phase closing arguments on grounds that they were unsupported by the evidence. The trial court ruled that appellant could not argue to the jury that he did not participate in the murders of the Kerry sisters, that he was not under the bridge when the Kerry sisters were pushed into the water, and that he could not coolly or fully reflect upon his aiding or encouraging in the murders because of his youth, mental capacity, or any threats from others. Appellant contends that the trial court's ruling "effectively precluded [him] from arguing his innocence to the jury."

▮▮▮ The accused may argue inferences justified by the evidence; the accused

may not argue inferences unsupported by the facts. *State v. Owens,* 827 S.W.2d 226, 232 (Mo.App.1991); *see also State v. Clemmons,* 753 S.W.2d 901, 909 (Mo. banc), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). With respect to the issue of appellant's presence under the bridge at the time of the murders, there was no evidence, and no reasonable inference to be derived from the evidence, that appellant was anywhere other than under the bridge when Julie and Robin Kerry were pushed off the pier. The evidence at trial was that, after the multiple rapes of the sisters, appellant took one of the Kerry sisters down a manhole to a metal platform under the deck of the bridge and remained there with her. Shortly thereafter the other Kerry sister and Tom Cummins were forced down the manhole. Cummins testified that he recognized the voice telling them to move off the platform onto the concrete pier of the bridge as being that of appellant, who Cummins believed to be the youngest and shortest of the assailants. Cummins testified that appellant told Robin Kerry and Cummins not to touch each other. Once the victims were on the pier, Cummins saw a hand push Julie Kerry; Robin Kerry was then pushed from the pier in the same manner. Appellant then told Cummins to "jump," and he jumped off the pier. Cummins testified that he believed appellant was the person who pushed the Kerry sisters, although he acknowledged that he had seen only a hand and foot and could not identify them. According to Winfrey, who was not present under the bridge at this time, appellant and Clemons met Winfrey and Marlin Gray at the end of the bridge, and Clemons said, "We pushed them off. Let's go." The evidence does not, therefore, support an argument from which the jury could infer that appellant did not participate in the murders of the Kerry sisters and that he was not under the bridge when the Kerry sisters were pushed into the water.

■ With respect to appellant's ability to deliberate, there is no credible evidentiary basis for an argument that age or mental condition precluded deliberation. There is no plain error.

■ Appellant objected to the state's submission of the following instructions:

## INSTRUCTION NO. 5

Under Counts I and II and Instructions No. ___, No. ___, No. 9, No. 10, No. 11, No. 12, No. 13, No. 15, No. 16, No. 17, No. 18, No. 19, No. 20, No. 21, No. 22, No. 23, No. 24, No. 25 a person is responsible for his own conduct and he is also responsible for the conduct of other person in committing an offense if he acts with them with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other persons in committing it.

## INSTRUCTION NO. 6

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on April 5, 1991 in the City of St. Louis, State of Missouri, the defendant or Reginald Clemons caused the death of Julie Kerry by pushing her from a bridge into a river causing her to drown, and

Second, that the defendant or Reginald Clemons knew or was aware that his conduct was practically certain to cause the death of Julie Kerry, and

Third, that the defendant or Reginald Clemons did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,

then you are instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the death of Julie Kerry, the defendant aided or encouraged Marlin Gray or Reginald Clemons in causing the death of Julie Kerry, and reflected upon this matter coolly and fully,

then you will find the defendant guilty under Count I of murder in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions,

you must find the defendant not guilty of murder in the first degree.

If you do find the defendant guilty under Count I of murder in the first degree, you will return a verdict finding him guilty of murder in the first degree.

### INSTRUCTION NO. 15

As to Count II, if you do not find the defendant guilty of murder in the first degree as submitted in Instruction No. 13, you must consider whether he is guilty of murder in the second degree under this Instruction.

As to Count II, if you find and believe from the evidence beyond a reasonable doubt:

First, that on April 5, 1991, in the City of St. Louis, State of Missouri, the defendant or Reginald Clemons caused the death of Robin Kerry by pushing her from a bridge into a river causing her to drown, and

Second, that the defendant or Reginald Clemons knew or was aware that his conduct was practically certain to cause the death of Robin Kerry,

then you are instructed that the offense of murder in the second degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Third, that with the purpose of promoting or furthering the commission of murder in the second degree, the defendant aided or encouraged Marlin Gray or Reginald Clemons in committing that offense,

then you will find the defendant guilty under Count II of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree under this instruction, but you must then consider whether he is guilty of murder in the

second degree-felony (robbery in the first degree) under Instruction No. 16.

If you do find the defendant guilty under Count II of murder in the second degree, you will return a verdict finding him guilty of murder in the second degree.

All three instructions substantially follow the pattern instructions of MAI–CR 3d. Instruction No. 5 was submitted separately under the authority of MAI–CR 3d 304.04, Notes on Use 3 (1987).[4] Instruction Nos. 6 and 15 follow the language of MAI–CR 3d 313.02 and 313.04, respectively, properly modified by 304.04.

Appellant contends that the instructions misstate the law of accessory liability in violation of his right to due process of law. A person with the required culpable mental state may be held criminally liable for an offense committed by the conduct of another person for which he is "criminally responsible." § 562.036, RSMo 1994. A defendant may be held criminally responsible for the conduct of another when:

> [e]ither before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense.

§ 562.041.1(2), RSMo 1994. Appellant contends that the legislature's use of "aid" in section 562.041.1(2) necessarily implies that a defendant must act affirmatively to be found guilty under that statute. Appellant concedes that he was present on the night of the murders and participated in the rape and robbery of the victims, but denies pushing either victim off the bridge. The use of the word "encouraged" in the instructions, he contends, allowed the state to prove only that he was "passively present" at the murders, rather than affirmatively acting toward their commission; thus, as a basis for his conviction on murder in the first degree, the jury may have convicted him simply because they "believed his actions and presence 'encouraged' the others."

---

**4.** This Court amended MAI–CR 3d 304.04 effective October 1, 1994. Unless otherwise noted, citation within this point is to the version of the instruction in effect at the time of appellant's trial, dated January 1, 1987.

The law of accessory liability derives from statutes enacted by the legislature, construed by the courts when required. Prior to the enactment of section 562.041, Missouri's accomplice liability statutes abrogated the significance of the common law distinction between parties to a felony. *See State v. Butler,* 310 S.W.2d 952, 957 (Mo.1958); *State v. West,* 484 S.W.2d 191, 195 (Mo.1972). Section 556.170, RSMo 1969, (repealed 1979) provided that a principal in the second degree or an accessory before the fact "may be charged, tried, convicted and punished in the same manner, as the principal in the first degree." A principal in the second degree was defined as a person "who is present, aiding and abetting the fact to be done." *State v. Stidham,* 305 S.W.2d 7, 15 (Mo. 1957).

Enacted in 1979, section 562.041 further refined the law of accomplice liability for criminal conduct. The legislature completely did away with degrees of principal actors and the connotations each held at common law. Section 562.041.1(2) addresses two separate situations in which a defendant may be held criminally responsible for the conduct of another: (1) "causing an innocent or irresponsible person to commit the conduct"; and (2) "accessorial liability by aiding and abetting...." Mo.Ann.Stat. § 562.041 (Vernon 1979), comment to 1973 proposed code. Disposition of the point turns upon whether the phrase "aids or agrees to aid or attempts to aid" in section 562.041.1(2) is read to include the phrase "aids or encourages."

■ Courts have long engaged in construing statutes and in defining terms contained in them when the statute does not provide definition. The doctrine of accomplice liability traditionally has been defined by decisional law as unlawful "aiding and abetting," which comprehends any of a potentially wide variety of actions intended by an individual to assist another in criminal conduct. The broad concept of "aiding and abetting" plainly encompasses acts that could be construed as "encouragement" or its derivation.

The law is well laid down that any person who is present at the commission of a trespass, encouraging or exciting the same by words, gestures, looks, or signs, or who in any way or by any means countenances or approves the same, is in law deemed to be an aider and abettor, and liable as a principal.

*Stidham,* 305 S.W.2d at 15. Although presence at the crime scene, or presence combined with a refusal to interfere, without more, is not sufficient to convict a defendant as a criminal accomplice, *State v. Castaldi,* 386 S.W.2d 392, 395 (Mo.1965), no particular physical act is necessary in order to find guilt; mere encouragement is enough. *See State v. Stockdale,* 415 S.W.2d 769, 772 (Mo. 1967) ("Evidence fairly showing any form of affirmative participation, or that the accused in any way aided, abetted or encouraged another in the commission of a crime, is sufficient to support a conviction."); *State v. Lute,* 608 S.W.2d 381, 384 (Mo. banc 1980) ("[O]ne who knowingly and intentionally aids or encourages the commission of an offense is guilty *of that offense.*") (emphasis in original); *see also* 22 C.J.S. *Criminal Law* § 135 (1989) (An aider and abettor "need not have participated in every phase of the criminal venture.... Manner of participation is not an element of the offense; proof of any form of participation is enough to support his conviction."). Even subsequent to the enactment of section 562.041 in 1979, the courts of this state, almost universally, have continued to construe aid given to another actor in a criminal enterprise to include encouragement. *See, e.g., State v. Reuscher,* 827 S.W.2d 710, 717 (Mo. banc 1992), *cert. denied,* 506 U.S. 837, 113 S.Ct. 114, 121 L.Ed.2d 71 (1992) (holding that in order to convict a defendant of capital murder under a theory of accomplice liability, the jury must find that the defendant "acted with or aided or encouraged another person for the purpose of committing the murder."); *State v. Kilgore,* 771 S.W.2d 57, 68 (Mo. banc), *cert. denied,* 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989); *State v. Fuller,* 880 S.W.2d 589, 593 (Mo.App.1994). In Missouri, then, the law of aiding and abetting has long been deemed to include acts of encouragement.

Appellant argues that the legislature intended by the enactment of section 562.041 in 1979 to alter the traditional definition of ac-

cessories to a crime as aiders and abettors. Appellant disregards, however, that the prior version of the accomplice liability statute, § 556.170, RSMo 1969, also did not use either "encourage" or "abet" in defining accessorial liability. There is no evidence of legislative intent to alter the traditional definition of accessories to a crime as aiders and abettors.

Use of the word "encourage" in the instructions at issue in this point on appeal was not error. Use of the word in MAI–CR 3d 304.04 is founded in a well-settled decisional construction of Missouri's law of aiding and abetting. When a defendant encourages another, he or she is more than merely present at the scene of a crime. As it is used in Instruction Nos. 5, 6 and 15, "encouraged" indicates a sufficiently active role in the criminal act such that criminal liability may validly be imposed; it is the equivalent of conduct that "by any means countenances or approves" the criminal actions of another, thereby warranting that the actor in law be "deemed an aider and abettor, and liable as a principal." *Stidham*, 305 S.W.2d at 15. The point is denied.

■ Appellant raises numerous additional claims relative to Instruction No. 6. Appellant first contends that, because Paragraph Third of Instruction No. 6 alleged defendant *or* Reginald Clemons knew or was aware that his conduct was practically certain to cause the death of Julie Kerry, the jury was not required to find that appellant deliberated, in violation of the requirement that a first degree murder instruction premised on accessory liability must ascribe deliberation to the defendant. *State v. Ervin*, 835 S.W.2d 905, 923 (Mo. banc 1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *State v. Bell*, 906 S.W.2d 737, 739 (Mo.App.1995); MAI–CR 3d 304.04, Notes on Use 8(b).

Appellant's contention is mistaken. The first three paragraphs of Instruction No. 6 set forth the elements of first degree murder. The instruction by its terms requires the jury to find the defendant guilty only if each and every one of the elements contained in the instruction is found and believed beyond a reasonable doubt. Paragraph

Fourth, then, attributes each of the elements for accessory liability, including that the defendant "reflected upon this matter coolly and fully." The quoted language submits the element of deliberation specifically as to appellant. There is no error.

Appellant claims that the use of the phrase "reflected upon this matter coolly and fully" in Paragraph Fourth did not require the jury to find that appellant deliberated. Appellant points to the 1994 revision of the Notes on Use to MAI–CR 3d 304.04, which replaced the phrase "reflected upon this matter coolly and fully" with the word "deliberation." *Compare* MAI–CR 3d 304.04, Notes on Use 7(c) (1987), *with* MAI–CR 3d 304.04, Notes on Use 8(b) (1994). Appellant claims that the modification demonstrates that Instruction No. 6 was legally erroneous. This Court made clear in *State v. Petary*, 790 S.W.2d 243, 246 (Mo. banc), *cert. denied*, 498 U.S. 973, 111 S.Ct. 443, 112 L.Ed.2d 426 (1990), however, that modification of a pattern instruction does not show that the original instruction was submitted in error. The instructional language correctly defined the concept of deliberation. Instruction No. 6 did not relieve the state of its burden of proving deliberation.

■ Appellant seeks plain error review of his contention that the reference in Paragraph Fourth to the defendant's aiding in "causing the death" of the victim, rather than in "committing the offense," is improper because the defendant "could be convicted even if he furthered or aided in a lesser degree of homicide, or in fact no homicide at all since 'death' is not necessarily 'murder.'" As discussed *supra*, the first three paragraphs of Instruction No. 6 require the jury to find each of the elements of the offense charged—in the present case, that "the offense of murder in the first degree has occurred." There is no plain error.

■ Appellant asserts that Instruction No. 6 improperly modified MAI–CR 3d 304.04. When an MAI–CR instruction is applicable and is not given in accordance with the Notes on Use, it shall constitute error and its prejudicial effect is to be judicially determined. *State v. Gray*, 887 S.W.2d at

386; Rule 70.02(c). A defendant is prejudiced by an erroneous instruction when the jury may have been adversely influenced by it. *Id.* Appellant argues that it was error to state in the final paragraph of Instruction No. 6, regarding Julie Kerry, "[i]f you do find the defendant guilty under Count I of murder in the first degree, you will return a verdict finding him guilty of murder in the first degree."

Although the language of which appellant complains does not appear in MAI–CR 3d 313.02, the verdict form for first degree murder, appellant offers no explanation of how the extraneous language resulted in prejudice. *See Gray,* 887 S.W.2d at 386–87 (finding no plain error in instruction with identical language). The instruction did not misdirect the jury with regard to the law, nor did the extraneous language adversely influence the jury.

Appellant claims that reference to Marlin Gray in Paragraph Fourth of Instruction No. 6 is "misleading, ambiguous, and confusing." *See State v. Isa,* 850 S.W.2d 876, 902 (Mo. banc 1993). Appellant notes that, although the elements of the crime in Instruction No. 6 are ascribed to "the defendant or Reginald Clemons," Paragraph Fourth states that "the defendant aided or encouraged *Marlin Gray* or Reginald Clemons in causing the death of Julie Kerry" (emphasis added).

The reference to Gray, while not a correct usage of MAI–CR 3d 304.04, was not prejudicial error. Although the evidence that appellant and Clemons were the only two perpetrators present under the bridge when the victims were pushed was strong, conflicting testimony made it possible to infer that Gray was present.[5] If the jury found that appellant aided or encouraged Clemons in causing Julie Kerry's death, the reference to Gray was merely superfluous and did not adversely influence the jury. If the jury found that appellant aided or encouraged Gray in causing the death, the reference to Gray in the instruction would not have an adverse effect

because the state is not required to prove that a defendant's accomplice committed murder in the first degree in order to convict the defendant of murder in the first degree for his acts in aiding the commission of murder. *Ervin,* 835 S.W.2d at 923. The jury could properly determine that appellant aided or encouraged Gray and find appellant guilty of first degree murder without finding that Gray committed first degree murder as provided in the first three paragraphs of Instruction No. 6. The trial court did not err in submitting Instruction No. 6.

## PENALTY PHASE

As stated above, the trial court assessed punishment after the jury was unable to agree on the issue. Where a judge, rather than a jury, is the trier of fact, the reviewing court presumes that inadmissible evidence is not prejudicial because trial courts are presumed not to consider improper evidence when sentencing the defendant. *State v. Shurn,* 866 S.W.2d 447, 462–63 (Mo. banc 1993); *McMillin,* 783 S.W.2d at 96; *State v. Six,* 805 S.W.2d 159, 167 (Mo. banc), *cert. denied,* 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). Although there is a presumption that the evidence and arguments challenged by appellant were not prejudicial, this Court will review the merits of appellant's allegations because appellant claims that, but for the errors, the jury may have assessed punishment at life imprisonment without the possibility of parole. *See Shurn,* 866 S.W.2d at 462–63.

Appellant contends that the trial court abused its discretion in overruling his objection to the penalty-phase testimony of Stephanie Whitehorn. Whitehorn testified during the penalty phase that while she was on the stand as a witness in the guilt phase, appellant mouthed the words, "I'm going to get you." The trial court had earlier denied the state's request to recall Whitehorn as a witness in the guilt phase, noting the "highly prejudicial nature" of evidence unrelated to the charges against appellant or the subject of Whitehorn's guilt-phase testimony. The

---

**5.** Defense counsel cross-examined Tom Cummins regarding an account he gave to a police officer stating that Marlin Gray, not appellant, told Cummins to jump from the bridge. Cummins denied any recollection of the statement.

court later allowed Whitehorn to testify to appellant's threat in the penalty phase. Appellant contends that the trial court should have excluded Whitehorn's testimony because it was unreliable and its prejudicial nature outweighed its probative value.

■■■ The trial court has discretion during the punishment phase to admit whatever evidence it deems helpful to the jury in assessing punishment. *Six,* 805 S.W.2d at 166. The jury may consider not only the nature and circumstances of the crime but, also, the character of the defendant. *Id.* The defendant's character is highly relevant to penalty phase deliberations. *State v. Brown,* 902 S.W.2d 278, 281 (Mo. banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995).

The trial court did not abuse its discretion. Testimony regarding an alleged threat made to one of the state's witnesses during trial is relevant to appellant's character. Any question as to the reliability of Whitehorn's testimony goes to the weight of the evidence, not its admissibility. *See Six,* 805 S.W.2d at 167. Appellant's argument on the point is further weakened by the fact that the trial judge sentenced appellant and is presumed not to have been affected in sentencing by arguably prejudicial evidence. *Id.; see also McMillin,* 783 S.W.2d at 96. The trial court did not abuse its discretion in permitting the jury to hear evidence of appellant's alleged threat to Whitehorn.

■■■ Appellant asserts that the trial court also erred in refusing to allow defense counsel to testify to rebut Whitehorn's testimony. As part of her objection to Whitehorn's penalty-phase testimony, defendant's counsel stated that she had been sitting next to appellant during Whitehorn's testimony in the guilt phase and did not observe appellant mouth the alleged threat. Appellant contends that the trial court's ruling placed counsel in a position of conflict, because, in addition to her role as penalty-phase counsel, she became a potential witness as well. *See Nunn v. State,* 778 S.W.2d 707, 710–11 (Mo. App.1989).

Appellant's contentions are without merit. Defense counsel was not offered as a penalty-phase witness. *See McMillin,* 783 S.W.2d at 97. Although defense counsel stated during her objection to Whitehorn's testimony that "it was [her] understanding that the court would not allow counsel to take the stand," the trial court's only response to defense counsel's argument was that "[t]he objection to the introduction of [Whitehorn's] testimony is overruled and denied." Nothing in the record reflects that the trial court was asked to admit or exclude defense counsel's testimony as a witness. Even assuming, *arguendo,* that the trial court precluded defense counsel from testifying, the absence of defense counsel's testimony did not prejudice appellant. Defense counsel conceded that she was concentrating on the witness and her notes; she had not, therefore, been observing appellant at all times during Whitehorn's testimony. Appellant made no offer of proof that defense counsel could conclusively contradict Whitehorn's testimony. Appellant was not prejudiced by the fact that defense counsel did not testify. *See State v. Foster,* 700 S.W.2d 440, 444 (Mo. banc 1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986). The point is denied.

Appellant claims that the prosecutor made several improper comments during closing argument of the penalty phase of the trial. Appellant contends that the trial court erred in overruling his objection and request for a mistrial after the prosecutor stated that appellant could be released by executive clemency if given a life sentence:

> [Defense counsel] says he will be there for the rest of his life forever. These are laws we are creating here.... I would indicate that the law is plain. That by executive clemency, a person can be released.

Appellant requests plain error review of the trial court's failing, *sua sponte,* to declare a mistrial after the prosecutor allegedly minimized the jurors' sense of responsibility in assessing punishment. The prosecutor argued:

> [I]f you cannot agree on punishment, as a last resort, and only I suggest to you, as a last resort, because you are people of this community, and you have to speak for us. You can return the form of verdict that says the judge may do it.

Appellant contends that the prosecutor's comments regarding executive clemency and the jury's role in determining punishment violated *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), in which a plurality of the United States Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. at 2639. Appellant claims that the prosecutor's comments caused the jury to impose the death penalty based on factors "wholly irrelevant to legitimate sentencing concerns." *See id.* at 332, 105 S.Ct. at 2641.

"To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989); *see also State v. Feltrop*, 803 S.W.2d 1, 9 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991); *Clemmons*, 753 S.W.2d at 910–11. *Caldwell* only prohibits misleading the jury as to its role in the sentencing process; it does not prohibit correct statements of the law. *Dugger*, 489 U.S. at 407, 109 S.Ct. at 1215; *Feltrop*, 803 S.W.2d at 9.

■ There is no reasonable probability that the statement under scrutiny misled the jury or improperly described the role assigned to the jury by law. The challenged comments correctly stated the law regarding the jury's role in sentencing as contained in the instructions. The statement regarding executive clemency accurately reflected Missouri law on the possible punishments for first degree murder. *See* § 565.020.2, RSMo 1986; *State v. White*, 813 S.W.2d 862, 865 (Mo. banc 1991), *cert. denied*, 502 U.S. 1103, 112 S.Ct. 1193, 117 L.Ed.2d 434 (1992) (citing *Feltrop*, 803 S.W.2d at 9). Furthermore, the prosecutor reminded the jury of its "primary" role in the assessment of punishment.

The jury was also instructed that "[i]t is your duty to render such verdict under the law and the evidence concerning the punishment to be imposed as in your reason and conscience is true and just." *See* MAI–CR 3d 313.49; *Clemmons*, 753 S.W.2d at 911. There is no *Caldwell* violation.

■ Appellant's contention that the prosecutor's comments improperly referred to the possibility of clemency, probation and parole is likewise without merit. Although references to clemency and legislative intervention in reducing sentences have been held to be improper in Missouri, *see State v. McDonald*, 661 S.W.2d 497, 506 (Mo. banc 1983), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985); *State v. Lewis*, 443 S.W.2d 186, 189–90 (Mo.1969),[6] there is no error resulting from the prosecutor's correct statements of the law. The United States Supreme Court addressed the question in *California v. Ramos*, 463 U.S. 992, 1009, 103 S.Ct. 3446, 3457–58, 77 L.Ed.2d 1171 (1983), and determined that an instruction permitting a capital sentencing jury to consider the governor's power to commute a life sentence did not unconstitutionally minimize the jurors' role in the sentencing process. The trial court did not abuse its discretion in overruling appellant's objection and denying appellant's request for a mistrial after the prosecutor's statement regarding executive clemency, nor did the trial court plainly err in failing to declare *sua sponte* a mistrial after the prosecutor commented on the jury's role in sentencing.

■ Appellant contends that the trial court erred in overruling his objection to the prosecutor's penalty phase argument that appellant showed a lack of remorse for the crimes. He relies upon cases from other jurisdictions in which courts found that lack of remorse is not an element of the statutory aggravating circumstance that the murder was "especially heinous, atrocious or cruel." *See, e.g., Wike v. State*, 596 So.2d 1020, 1025

---

6. The prosecutor's one reference to executive clemency is distinguishable from the extensive argument offered in *Lewis*, 443 S.W.2d at 189, and several out-of-state cases relied upon by appellant in which either the prosecutor or the court not only specifically mentioned, but emphasized, the function of the parole board and executive clemency procedure. *Contrast, e.g., Poole v. State*, 295 Md. 167, 453 A.2d 1218, 1233 (1983); *State v. Lindsey*, 404 So.2d 466, 484–85, 487–88 (La.1981).

(Fla.1992); *Pope v. State,* 441 So.2d 1073, 1078 (Fla.1983). Missouri has reached the opposite conclusion in cases in which the murder involved "depravity of mind." *See* § 565.032.2(7); *State v. Harris,* 870 S.W.2d 798, 813 (Mo. banc), *cert. denied,* — U.S. ——, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). In *State v. Oxford,* 791 S.W.2d 396, 402 (Mo. banc 1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 769, 112 L.Ed.2d 789 (1991), this Court considered the defendant's lack of remorse in making its independent review of the death sentence under section 565.035.3, RSMo 1986. Further, in contrast to the cases cited by appellant, the prosecutor in the present case did not infer an absence of remorse from the defendant's failure to take the stand in the punishment phase. *See, e.g., Pope,* 441 So.2d at 1078; *State v. Arther,* 290 S.C. 291, 350 S.E.2d 187, 191 (1986). Appellant's lack of remorse for the crimes for which he was convicted was clearly relevant to his sentencing; thus, the trial court did not err in overruling appellant's objection.

■■■ Appellant requests plain error review of the trial court's failure to prohibit, *sua sponte,* the prosecutor from arguing facts allegedly outside the record and offering allegedly improper personalization to the jury in his penalty-phase argument. The prosecutor remarked that "children killing children" is a societal problem and that children who kill "do not value your life or my life or anyone's life." The prosecutor argued further:

It's just so basic to human nature that you don't kill another person unless it's in self-defense, and that's what we have here. We have the self-defense of our existence of our society at stake. When people can go killing without ever the fear of never having their own life taken, it's over. Concede. You know, but you can't get far enough out of Dodge, you know, if you do that.

Later the prosecutor argued:

And to say that you're not better than him if you kill. You're not killing. This is defense of yourself, defense of our society, this is justice for what he chose to do. You didn't choose it. You didn't choose to be here. You didn't choose for the Kerrys to get killed that night. You didn't choose to have some young man rape them. For God's sake, it is not your fault. It is not upon your head.

■■■ The parties have wide latitude in arguing during the penalty phase of a first-degree murder case. *Shurn,* 866 S.W.2d at 463. The prosecutor, however, may not make statements that imply knowledge of facts not before the jury, *id.* at 460, nor may he or she personalize argument to the jury. *Id.* at 463. The prosecutor may call upon the jurors' common experience in arguments concerning the prevalence of crime in the community and the personal safety of its inhabitants. *Clemmons,* 753 S.W.2d at 909. The prosecutor may refer to the need for strong law enforcement as a deterrent to crime and infer the effect of the jury's failure to perform its duty and uphold the law. *State v. Gilmore,* 681 S.W.2d 934, 944 (Mo. banc 1984). The prosecutor's statements concerning children who kill children were not improper; the argument called upon the jurors' common experience with crime in the community and referred to personal safety issues and deterrence.

Regarding the argument on societal self-defense, appellant emphasizes the prosecutor's use of the word "you," claiming that the prosecutor offered improper personalization to the jury. Appellant claims that the argument cannot be distinguished from that in *Storey,* 901 S.W.2d at 901–02, in which the prosecutor argued:

I want you to think about that guy right there in the front row, [the victim's brother]. What if he had happened onto this brutal thing and seen his very close sister in the process of [being] murdered? Would he have been justified in taking the Defendant's life? Yes. Without question. Without question.

This Court held that the argument was reversible error for several reasons, one being that it equated the jury's function to self-defense while specifically referring to the crime. *Id.* at 902.

■■■ The prosecutor's comments in the present case are not comparable to argument in *Storey,* where the prosecutor appealed to

the jury's personal fears and emotions by invoking the image of a brother's seeing his sister brutally murdered. Unlike the argument in *Storey,* the prosecutor's comments in this case did not equate the jury's function of imposing punishment to self-defense in a way that appears calculated to inflame the jury. Rather, the argument under scrutiny is similar to the penalty-phase argument upheld by this Court in *Shurn,* 866 S.W.2d at 464:

> You know, it's not always wrong to kill. It's maybe always difficult to kill; but if you kill in self-defense, that's not wrong. If you kill in a just war, that is not wrong. It's right. If somebody is going to kill your child and you have a chance to kill them to prevent it, would you do it? Of course....

Here, as in *Shurn,* the prosecutor merely made reference to a circumstance, such as sentencing a defendant to death, in which it is legal to take a human life. *See Shurn,* 866 S.W.2d at 464. The prosecutor's use of the word "you" has no special significance when the argument is considered in context. The trial court did not plainly err.

■ In a directly related contention, appellant claims that the postconviction court clearly erred in denying his Rule 29.15 motion alleging ineffective assistance for counsel's failure to object to the prosecutor's penalty-phase closing argument allegedly arguing facts outside the record and offering improper personalization to the jury. Counsel cannot be deemed ineffective for declining to make non-meritorious objections. *Six,* 805 S.W.2d at 167. The point is denied.

■ Appellant contends that the trial court erred in denying his request for a second punishment-phase hearing after the

jury was unable to agree upon the punishment for first degree murder of Julie Kerry.

Because the jury was unable to agree on the issue of punishment, the trial judge set a date on which the court would sentence appellant. § 565.030.4.[7] Defense counsel moved for consideration of mitigation evidence by the sentencer prior to assessment of punishment. Defense counsel wanted to offer in a second punishment-phase hearing the testimony of Dr. Engum, a neuropsychologist who evaluated appellant prior to trial and concluded that appellant was mildly mentally retarded. Appellant had not called Engum to testify in the punishment phase because defense counsel believed that some of Engum's conclusions could be prejudicial to appellant. Defense counsel claimed that appellant had a right to a second punishment-phase hearing at which Engum could be called as a witness because the sentence was being imposed by the court rather than the jury. The court denied appellant's motion, noting that appellant had a complete opportunity to present the evidence to the jury in the punishment phase of the trial.

The court assessed punishment at death. The trial judge stated that he would later hear Engum's testimony, at the time of allocution and sentencing under Rule 29.07(b)(1). Although stating that he would not assess punishment on the basis of the evidence, at allocution and sentencing the trial judge permitted Engum to testify regarding the contents of his report. The state presented an expert with opposing views. The court then formally sentenced appellant to death.

Appellant makes a novel argument. He argues that section 565.030.4 requires the trial court to conduct a second punishment-

---

7. Section 565.030.4, RSMo 1986, provides in relevant part:

> If the trier at the first stage of a trial where the death penalty was not waived finds the defendant guilty of murder in the first degree, a second stage of the trial shall proceed at which the only issue shall be the punishment to be assessed and declared. Evidence of any of the aggravating or mitigating circumstances listed in subsection 2 or 3 of section 565.032 may be presented subject to the rules of evidence at criminal trials....
> (4) If the trier is a jury it shall be so instructed. If the trier assesses and declares the pun-

> ishment at death it shall, in its findings or verdict, set out in writing the aggravating circumstance or circumstances which it found beyond a reasonable doubt. If the trier is a jury it shall be instructed that if it is unable to decide or agree upon the punishment the court shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor or death. The court shall follow the same procedure as set out in this section whenever it is required to determine punishment for murder in the first degree.

phase hearing under the circumstances presented in this case. It is unnecessary, however, to address appellant's statutory argument for the reason that he has failed to demonstrate that he suffered prejudice as a result of the trial court's denial of a second punishment-phase hearing. In the punishment phase of the trial, the court acted as both trier of fact and sentencer under section 565.030.4(4). Under Rule 29.05, the trial court has authority to reduce the punishment at the time of formal sentencing. The trial court heard the evidence before formally imposing sentence. In announcing the formal sentence, the court expressly noted that it had considered Engum's testimony. The court concluded, however, that the punishment of death previously assessed was appropriate.

■ Appellant concedes that he cannot demonstrate that the trial court failed to consider Engum's testimony before sentence was finally imposed. Appellant nevertheless contends that the trial court's denial violated his due process rights because he was not afforded the opportunity to present evidence of mitigating circumstances prior to the assessment of punishment. Appellant asks this Court to draw a fine and unnecessary distinction between the assessment of punishment and the formal sentencing in a case in which the trial court both assesses punishment and formally imposes sentence. For purposes of due process under the facts of this case, it is a distinction without a difference. *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), fail to support appellant's argument. *Eddings* and *Lockett* provide that a capital defendant may present any relevant mitigating evidence at trial, and the sentencer is required to consider that evidence. *Eddings,* 455 U.S. at 112–14, 102 S.Ct. at 875–77; *Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964–65. The trial courts in *Eddings* and *Lockett* refused to consider certain mitigating evidence as a matter of law. *Eddings,* 455 U.S. at 113, 102 S.Ct. at 876; *Lockett,* 438 U.S. at

594, 597, 98 S.Ct. at 2959, 2960–61. In contrast, the court here considered Engum's testimony in formally sentencing appellant, although it was not required to hear the evidence because it was not presented at trial. The court's sentencing procedure met the due process requirements of *Eddings, Lockett,* and their progeny. The point is denied.

Appellant raises two points of error concerning the approved MAI–CR 3d instruction submitted to the jury during the penalty phase on the issue of mitigating circumstances.

Appellant first claims that the trial court erred by not submitting his proffered Instructions A and B. Proposed Instruction A asked the jury to consider the statutory mitigating circumstance of whether his "capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." § 565.032.3(6), RSMo 1986. In proposed Instruction B, appellant specifically listed six additional nonstatutory mitigating circumstances.

■ Appellant argues that the failure to instruct specifically with a listing of all nonstatutory mitigating circumstances prevented the jury from considering all aspects of his character and record that could have supported a sentence less than death. *See Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964–65 (holding that the Eighth and Fourteenth Amendments require that the sentencer be allowed to consider any aspect of a defendant's character or record as a mitigating factor). He contends that each rejected mitigating factor is supported by the evidence presented during the penalty phase. By not specifically submitting the proposed list of mitigators, he argues, the instructions fail to provide for a full consideration by the jury of all nonstatutory mitigating circumstances "otherwise authorized by law and supported by the evidence," § 565.032.1(3), RSMo 1986,[8] as well as violating his rights under

---

**8.** The version of the statute applicable to the present case read as follows:

[T]he judge in a jury-waived trial shall consider, or he shall include in his instructions to the jury for it to consider:

. . . .

the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and sections 10, 18 and 21 of the Missouri Bill of Rights.

The argument is without merit. Instruction No. 37, the mitigating circumstances instruction, was patterned after MAI–CR 3d 313.44 (1989). It included the following statement: "You may also consider any circumstances which you find from the evidence in mitigation of punishment." This Court has repeatedly upheld the pattern instruction. "Because the jury is permitted to consider nonstatutory mitigating circumstances, there is no requirement that the instructions list nonstatutory mitigating circumstances." *State v. Mease,* 842 S.W.2d 98, 113 (Mo. banc 1992), *cert. denied,* 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993); *see also Wacaser,* 794 S.W.2d at 195; *State v. Wise,* 879 S.W.2d 494, 518 (Mo. banc 1994), *cert. denied,* — U.S. —, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995); *State v. Tokar,* 918 S.W.2d 753, 771–72 (Mo. banc 1996); MAI–CR 3d 313.44 (1989), Notes on Use 6 ("No instruction should be given, nor shall any paragraph be added, calling the jury's attention to any particular [mitigating] circumstance referred to in general by [the instruction]."). The language of the approved instruction sufficiently complies with the constitutional requirements governing the submission of mitigating circumstances.

■ Appellant further argues under this point that the trial court erred by not specifically submitting to the jury the nonstatutory mitigating circumstance that he has a full scale I.Q. of seventy, a fact gleaned from the evidence adduced during the penalty phase of the trial. Section 552.015.2(6), RSMo 1986, requires that evidence that the defendant did or did not suffer from a mental disease or defect be "admissible" for the purposes of determining "whether or not the defendant, if found guilty, should be sentenced to death . . . ." Appellant contends that, because testimony at the penalty phase of trial indicated that he was of below average intelligence and was mentally retarded, he had a mental disease or defect that the

(3) Any mitigating or aggravating circumstances otherwise authorized by law and sup-

trial court was required to submit to the jury as a mitigating circumstance "otherwise authorized by law." § 565.032.1(3); *see also* MAI–CR 3d 313.44 (1989), Notes on Use 5 ("[T]he Court upon request of the defendant should permit the jury to consider any evidence that the defendant suffered from a 'mental disease or defect' as that phrase is defined in Section 552.010, RSMo 1986 . . . ." The note further suggests a method of submission: "Whether the defendant had a mental disease or defect at the time of the murder of [name of victim in this count].").

As explained in the discussion above, Instruction No. 37 properly directed the jury to consider any mitigating circumstances it found from the evidence. No other listing of nonstatutory mitigating circumstances is required. Although proof of mental retardation may be used to demonstrate that a defendant, under the partial responsibility doctrine, lacked sufficient deliberation for the crime charged, *see State v. Strubberg,* 616 S.W.2d 809, 816 (Mo. banc 1981), appellant's proffered instruction was not phrased in such a manner. Appellant argues only that the jury should be charged separately with the allegations relating to his low I.Q. Nowhere in his instruction does the phrase "mental disease or defect" appear. At no time did appellant adduce evidence directly indicating that he was laboring under mental retardation or other mental abnormality. The trial court did not err.

■ Appellant alternatively argues that the trial court erred in failing to submit specifically to the jury, along with his age, the statutory mitigating circumstance of whether his capacity to "appreciate the criminality of his conduct to conform his conduct to the requirements of law was substantially impaired," § 565.032.3(6), RSMo 1986, as set out in appellant's proffered Instruction A. He argues that, because he requested it and the evidence supported it, the trial court was required by statute to submit to the jury the issue of his substantial impairment. § 565.032.1(2), RSMo 1986.

ported by the evidence and requested by a party . . . .

In support of the submission, appellant cites only to testimony that he may have been under the influence of alcohol and marijuana the evening of the murders as well as his intelligence and low I.Q. test scores. Appellant did not adduce evidence to the effect that any of these general allegations had affected his mental state such that his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Because the evidence did not support the submission of appellant's substantial impairment under the statute, the trial court was not required to so instruct the jury.

■ In his next point, appellant argues that the trial court erred by submitting to the jury defendant's proposed mitigating circumstances instruction. That instruction read as follows:

### INSTRUCTION NO. 37

As to Count I, if you decide that one or more sufficient aggravating circumstances exist to warrant the imposition of death, as submitted in Instruction No. 35, each of you must then determine whether one or more mitigating circumstances exist which outweigh the aggravating circumstance or circumstances so found to exist. In deciding that question, you may consider all of the evidence relating to the murder of Julie Kerry.

You may also consider:

1. The age of the defendant at the time of the offense.

You may also consider any circumstances which you find from the evidence in mitigation of punishment.

It is not necessary that all jurors agree on the existence of the same mitigating circumstance. If each juror finds one or more mitigating circumstance sufficient to outweigh the aggravating circumstances found to exist, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole.

Instruction No. 37 is patterned after MAI–CR 3d 313.44 (1989).

Specifically, appellant claims that the instruction erroneously directs the jury that it "may also consider" any nonstatutory mitigating factors. Such discretionary language, he argues, improperly allows the jury to consider only those mitigating factors it chooses, rather than requiring that they consider all circumstances that may potentially mitigate his punishment. Because section 565.032.1(3) requires that the jury consider any mitigating circumstances "otherwise authorized by law" and supported by the evidence, appellant contends that mandatory, rather than discretionary, language must be used in the instruction. *See Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1982) ("[T]he sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'") (quoting *Eddings,* 455 U.S. at 114, 102 S.Ct. at 877).

Appellant requests plain error review of this point, which was not previously raised and preserved for appellate review. Appellant himself offered Instruction No. 37 and, "[h]aving done so, he has no cause for complaint." *McMillin,* 783 S.W.2d at 97. Nevertheless, this Court will review for plain error. This Court has previously ruled that the "may consider" language in MAI–CR 3d 313.44 does not preclude the sentencer from considering mitigating evidence in violation of *Skipper* and *Eddings. See, e.g., Tokar,* 918 S.W.2d at 771–72; *State v. Parker,* 886 S.W.2d 908, 929 (Mo. banc 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). The instruction properly vests in the jury the discretion to weigh all the mitigating evidence presented against the evidence of aggravating circumstances. "As such, it is in compliance with constitutional requirements governing the submission of mitigating circumstances." *State v. Debler,* 856 S.W.2d 641, 655 (Mo. banc 1993). The point is denied.

### RULE 29.15

■ Appellant alleges several instances of ineffective assistance of counsel.[9] To show

---

9. In nearly all instances, "counsel" is deemed to include co-counsel; according to the record,

that counsel's assistance was so defective as to require reversal of a conviction or death sentence, the movant must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In order to prevail on a claim of ineffective assistance of counsel, the movant must satisfy both the performance prong and the prejudice prong; if the movant fails to satisfy either prong, the reviewing court need not consider the other. *Sidebottom v. State*, 781 S.W.2d 791, 796 (Mo. banc 1989), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990). Counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2065–66. The movant must also overcome the presumption that the challenged action was sound trial strategy. *Id.* at 689, 104 S.Ct. at 2065. To show prejudice, the movant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. The movant has the burden of proving grounds for relief by a preponderance of the evidence. Rule 29.15(i).

■ Appellant contends that counsel failed fully to investigate and present available mitigating evidence regarding his mental state. Appellant claims that counsel was ineffective for failing to obtain a neuropsychological examination "in a timely manner" and present the evaluation at trial. The record reveals that trial counsel commissioned a neuropsychological examination by Dr. Engum approximately two weeks before trial. Engum was not called as a penalty-phase witness, however, because counsel felt that appellant could be damaged in the eyes of the jury by Engum's conclusion that appellant would act "like an animal" if under the influence of alcohol on the night of the crimes. Counsel provided a valid strategic

reason for the decision not to call Engum at trial.

Appellant also claims that, had counsel retained Engum earlier, counsel would have had more time to evaluate the test results, correct any problems with Engum's report, and prepare to put on his testimony at trial.[10] Appellant's allegation is unsupported by the evidence at the hearing. Counsel's decision not to call Engum was trial strategy. Furthermore, the motion court found that "the timing of counsels' retention of Dr. Engum had no effect on the adequacy of movant's defense." Its finding is not clearly erroneous.

■ Appellant claims that counsel was ineffective for failing to have appellant evaluated by an unspecified "psychiatrist/medical doctor." The selection of witnesses at trial is a "virtually unchallengeable" question of trial strategy. *Harris*, 870 S.W.2d at 816–17. Appellant does not suggest as a basis for his claim that the testimony of a psychiatrist or physician is preferable to that of the neuropsychologist retained by defense counsel. Additionally, appellant fails to show prejudice. The sole medical doctor offered in support of appellant's contention at the evidentiary hearing acknowledged that his conclusions were consistent with those of Engum, which the trial court considered prior to formal sentencing. The motion court did not clearly err in finding that counsel was not ineffective.

■ Appellant contends that counsel was ineffective for failing to present evidence by one Dr. Smith and Dr. Engum of the amount and types of alcohol appellant consumed on the night of the murders and how it affected his ability to deliberate. Evidence at trial revealed that each of the assailants, including appellant, drank approximately forty-ounces of beer on the night of the murders. After appellant's trial and conviction, defense counsel retained Dr. Smith, a psychologist specializing in alcohol abuse who evaluated ap-

---

both attorneys actively participated in both the guilt and penalty phases.

**10.** Appellant's claim that counsel could have selected other experts if they had retained Engum

earlier and discovered that some of his conclusions were unfavorable to the defense is waived because it was not presented in the Rule 29.15 motion. *See Ervin*, 835 S.W.2d at 929.

pellant. Smith testified at the evidentiary hearing that appellant told him he had consumed two fifths of wine and two forty-ounce containers of beer on the night of the murders. Smith concluded that appellant was "substantially impaired" in "his ability to understand and make independent judgment about his behavior" on the night of the crimes. Smith conceded, however, that it would make a difference in his diagnosis if appellant had lied to him about the amount of alcohol he consumed on the night of the crimes. The trial court concluded that "there was not credible evidence presented at the hearing that [appellant] was not capable of deliberating." It is the trial court's duty to weigh evidence and witness credibility. *Wise*, 879 S.W.2d at 506. The trial court's conclusion was not clearly erroneous.

As for Engum's testimony, appellant cannot demonstrate prejudice. Engum would have opined not only that alcohol consumption would cause appellant to act "like an animal," but, also, that if appellant were under the influence of alcohol, appellant would act "even further out of control in an irrational and unpredictable fashion." The trial court did not clearly err.

■■■ Appellant next argues that counsel rendered ineffective assistance in failing to request a court-ordered mental examination under section 552.020, RSMo 1994, to determine whether he was competent to proceed to trial. Appellant must show the existence of a factual basis indicating a questionable mental condition that should have caused his attorney to initiate an independent investigation of appellant's mental state. *See State v. Skelton*, 887 S.W.2d 699, 706 (Mo.App.1994). Absent some suggestion of mental instability, counsel has no duty to initiate an investigation of the accused's mental condition. *Id.* The need for an investigation is not indicated where the accused has the present ability to consult rationally with counsel and to understand the proceedings. *State v. Powell*, 793 S.W.2d 505, 509 (Mo. App.1990).

A psychiatrist testified at the evidentiary hearing that appellant lacked the ability to assist in his defense because of a mental defect. Appellant's trial counsel testified at the evidentiary hearing, however, that although she did not recall her specific reasoning for failing to request a pretrial mental examination, counsel had not witnessed any behavior that would lead to a belief that appellant was incompetent to stand trial. Based on conversations with appellant, counsel believed that appellant understood the events that took place on the night of the crimes, the charges against him, and the penalty he faced. Counsel testified further that she was reluctant to request a mental examination absent evidence that appellant was incompetent because "you have no control over who is selected to perform the examination.... [T]he prosecutor gets the results the same time you do. And you have no opportunity in advance to know ahead of time what's down the pike.... You have no opportunity to protect your client against what might be a very bad report." The motion court did not clearly err in finding that counsel's failure to request a pretrial mental examination did not constitute a failure to exercise the customary skill and diligence that a reasonably competent lawyer would have exercised under similar circumstances.

■■■ In another allegation of ineffective assistance, appellant contends trial counsel failed to call Earlyne Thomas, the assistant public defender who represented appellant at a lineup viewed by Tom Cummins, and to call Joseph Ledgerwood, a deputy juvenile officer present at the lineup. Thomas and Ledgerwood testified at the evidentiary hearing that when Cummins identified appellant, he stated that he did not "see [appellant] do anything." Appellant's Rule 29.15 motion alleged that Thomas and Ledgerwood would have supported his claim at trial that he did not participate in the murders. At the evidentiary hearing, appellant failed to inquire why defense counsel did not call Thomas and Ledgerwood.

■■■ If an attorney believes testimony would not provide unequivocal support of the client's position, it is a matter of trial strategy to decline to call the witness. *Schneider v. State*, 787 S.W.2d 718, 721 (Mo. banc), *cert. denied*, 498 U.S. 882, 111 S.Ct. 231, 112

L.Ed.2d 186 (1990). Thomas and Ledgerwood would not have provided unequivocal support of appellant's defense theory because Cummins' identification of appellant as the one who pushed the victims was based on his recognition of appellant's voice. Cummins admitted that he could not see anything during much of the attack because he was lying on the ground face-down or otherwise had his face covered by the assailants. Cummins himself conceded that, because of his position under the bridge, he could not see who pushed the victims. The motion court's conclusion that appellant did not suffer prejudice as a result of counsel's failure to call Thomas and Ledgerwood is not clearly erroneous.

■ Appellant alleges ineffective assistance of counsel in failing adequately to investigate or to present mitigating evidence regarding his background. The claim is meritless. Counsel is not required to present a defendant's background in mitigation in a death penalty case. *Schneider,* 787 S.W.2d at 721. In addition, appellant's aunt, uncle and grandmother each described appellant's deprived childhood in the penalty phase. The sole additional witness offered in support of appellant's claim at the evidentiary hearing was appellant's great-aunt; her testimony was no different in character from that of the three other relatives who testified at trial. Defense counsel testified at the evidentiary hearing that she was aware of the great-aunt but decided not to call her as a witness. Appellant fails to demonstrate that counsel's choice was not sound trial strategy. The motion court did not clearly err in concluding that counsel was not ineffective.

■ In a related point, appellant contends that the motion court clearly erred in excluding the testimony of clinical social worker Stephen Zegel at the evidentiary hearing. Zegel stated in an offer of proof that he had prepared a "social history" of appellant by using interviews with relatives and reviewing school and court records. Zegel concluded from the report that appellant was "dependent," "extremely vulnerable," and had "virtually no coping mechanisms." The motion court refused to admit Zegel's testimony, noting that it would be cumulative of testimony already given by a psychologist

and a psychiatrist, and stating that no showing had been made that the opinions of social workers had been accepted as a field of expertise by the scientific community.

■ Appellant's claim is without merit. Regardless of whether Zegel's testimony was cumulative, his testimony was inadmissible. Results of scientific procedures may be admitted only if the procedure is "sufficiently established to have gained general acceptance in the particular field to which it belongs." *State v. Davis,* 814 S.W.2d 593, 600 (Mo. banc 1991), *cert. denied,* 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992) (quoting *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923)). Appellant has failed to offer legal authority for the proposition that the opinions of social workers regarding the mental condition of criminal defendants meet the *Frye* standard. The motion court did not clearly err in excluding Zegel's testimony.

## UNCONSTITUTIONALITY OF MISSOURI DEATH PENALTY SCHEME

■ Appellant asserts that Missouri's death penalty scheme violates due process and the Eighth Amendment because this Court refuses to engage in meaningful proportionality review and because the imposition of the death penalty on appellant is inappropriate because of his age, mental capacity, and the fact that he had no prior contact with the criminal justice system. This Court has repeatedly considered and rejected appellant's arguments related to meaningful proportionality review. *Chambers,* 891 S.W.2d at 113; *Parker,* 886 S.W.2d at 933. Both this Court and the United States Supreme Court have considered and rejected appellant's claim relative to the imposition of the death penalty upon a sixteen-year-old defendant. *State v. Wilkins,* 736 S.W.2d 409 (Mo. banc 1987), *aff'd sub. nom., Stanford v. Kentucky,* 492 U.S. 361, 380, 109 S.Ct. 2969, 2980–81, 106 L.Ed.2d 306 (1989); *see also* § 565.020.2. There is no merit in appellant's contention that his age, when combined with his mental capacity and lack of prior contact with the criminal justice system, renders the imposition of the death penalty unconstitutional. The trial court

considered all the mitigating circumstances fairly presented by the evidence and did not find that they outweighed the aggravating circumstances beyond a reasonable doubt.

## INDEPENDENT REVIEW

Under section 565.035.3(1), (2), and (3) this Court is required to determine: (1) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether the statutory aggravating circumstances and any other circumstances found by the trial court were supported by the evidence; and (3) whether the sentence is excessive or disproportionate to the punishment imposed in similar cases.

■ There is no evidence in the record to suggest that the punishment imposed by the trial court was imposed under the influence of passion, prejudice, or any other arbitrary factor.

The trial court found the following statutory aggravating circumstances: that the murder of Julie Kerry was committed while appellant was engaged in the commission of the unlawful homicide of Robin Kerry, section 565.032.2(2); that the murder was committed while appellant was engaged in the attempted commission of the unlawful homicide of Thomas Cummins, section 565.032.2(2); that appellant committed the murder while knowingly aiding or encouraging Gray and Clemons in the perpetration of rape and attempted robbery, section 565.032.2(4); that the murder was outrageously or wantonly vile, horrible or inhuman, section 565.032.2(7); and, that appellant committed the murder for the purpose of avoiding his lawful arrest or that of Gray or Clemons, section 565.032.2(10). The evidence supported submissions and findings on all of the aggravating circumstances.

This Court has compared Missouri cases in which the death penalty was imposed on defendants who committed multiple homicides or attempted homicides. *State v. Gray,* 887 S.W.2d 369; *State v. Ramsey,* 864 S.W.2d 320 (Mo. banc 1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994); *State v. Mease,* 842 S.W.2d 98; *State*

*v. Hunter,* 840 S.W.2d 850 (Mo. banc 1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3047, 125 L.Ed.2d 732 (1993); *State v. Ervin,* 835 S.W.2d 905 (Mo. banc 1992), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *State v. Powell,* 798 S.W.2d 709 (Mo. banc 1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991); *State v. Reese,* 795 S.W.2d 69 (Mo. banc 1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1025, 112 L.Ed.2d 1106 (1991); *State v. Sloan,* 756 S.W.2d 503 (Mo. banc 1988), *cert. denied,* 489 U.S. 1040, 109 S.Ct. 1174, 103 L.Ed.2d 236 (1991); *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989). In other cases the death penalty has been imposed on defendants who committed murder in conjunction with other crimes involving force. *Gray,* 887 S.W.2d 369; *Hunter,* 840 S.W.2d 850; *State v. Six,* 805 S.W.2d 159; *Ervin,* 835 S.W.2d 905; *Powell,* 798 S.W.2d 709; *Reese,* 795 S.W.2d 69; *Griffin,* 756 S.W.2d 475. This Court has also compared cases involving murder to avoid arrest or detection. *Gray,* 887 S.W.2d 369; *Ramsey,* 864 S.W.2d 320; *Six,* 805 S.W.2d 159; *State v. Kilgore,* 771 S.W.2d 57; *Griffin,* 756 S.W.2d 475. Appellant's punishment is not excessive or disproportionate as compared with these similar cases.

Affirmed.

All concur.