Cecil CLAYTON, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 83355.

Supreme Court of Missouri,
En Banc.

Dec. 4, 2001.

Rehearing Denied Jan. 22, 2002.

Rebecca L. Kurz, Laura G. Martin, Asst. Public Defenders, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Adriane D. Crouse, Asst. Atty. Gen., Jefferson City, for respondent.

JOHN C. HOLSTEIN, Judge.

Cecil Clayton appeals the denial of his Rule 29.15 post-conviction relief motion by the circuit court of Jasper County. On appeal he raises four claims, all of which allege that the motion court should have found his trial counsel ineffective. Because the death penalty was imposed in Clayton's original trial, this Court has exclusive appellate jurisdiction. *Mo. Const. art. V, sec. 10;* order of June 16, 1988. The judgment is affirmed.

## FACTS AT TRIAL

The evidence that led to Clayton's conviction of first degree murder was compelling, but largely circumstantial. On the evening of November 27, 1996, a blue Toy-

ota pickup truck with wooden sides was observed in the driveway of the Dixie Seals' residence in Barry County, Missouri. The truck was like one Clayton had been driving earlier that day when he had a violent argument with his former girl-friend, the daughter of Mrs. Seals. Barry County deputy sheriff Christopher Castetter was summoned to investigate. Shortly after the truck left, deputy Castetter's vehicle was found sitting at an angle in the Seals driveway against a tree, its engine running fast and wheels spinning. Deputy Castetter was in the vehicle, mortally wounded by a single gunshot in the middle of his forehead.

Later Clayton arrived at the home of a friend, Martin Cole. He told Cole that he had shot a "cop" in the head and displayed a weapon to Cole. He wanted Cole to act as an alibi. The two proceeded to Clayton's house in the pickup truck where they were arrested, but not before Clayton managed to step to the side of his house where a pile of cement blocks were located. Later the police located a gun in the pile of blocks. The gun was determined to be the likely source of the bullet that killed Castetter. Paint chips similar to the paint on the pickup were found on the Castetter vehicle.

Though Clayton denied involvement in the murder when interrogated by police, he did say at one point that "he shouldn't have smarted off to me." In addition, Clayton later admitted his involvement in the killing to a jailhouse snitch, Robert Compton.

As noted above, the evidence was large-ly circumstantial. The only direct evidence implicating Clayton came from Cole and the snitch, both of whom had motives to fabricate testimony, as was highlighted by the defense. There were also some weaknesses in the circumstantial evidence that defense counsel explored. For exam-ple, no gunpowder residue was found on Clayton's hands or clothing, though Cole had residue on his left hand, and Cole was left-handed. In addition, defense counsel probed the uncertainty as to whether the officers actually observed Clayton deposit the gun in the pile of cement blocks, whether the bullet recovered from the victim was positively fired by the gun found in the pile of blocks, and whether the paint found on the victim's vehicle was conclusively determined to be from Clayton's truck.

A second line of defense had to do with a claim of diminished capacity due to a brain injury at a sawmill accident in 1972. Clayton's brother, Marvin, testified that after the injury, Clayton was changed. He broke up with his wife, began drinking alcohol and became impatient, unable to work and more prone to violent outbursts. A defense expert testified that due to his brain injury, which involved a loss of 7.7 percent of the brain, Clayton was incapable of deliberating, planning, or otherwise coolly reflecting on a murder when agitated. Another expert explained that due to the brain injury, Clayton was susceptible to suggestion, thus explaining the equivocal statements to police. Nonetheless, the jury found Clayton guilty of first-degree murder.

During the penalty phase, another brother, Jerry, was called to testify as to Clayton's childhood and life as a part-time pastor and evangelist prior to the sawmill accident and, after the accident, his marital breakup, drinking alcohol and his antisocial personality. A jail administrator and jail chaplain were called to testify regarding Clayton's good behavior and care for others in the jail while awaiting trial.

Clayton was sentenced to death. He appealed, and the conviction and sentence were affirmed in *State v. Clayton*, 995 S.W.2d 468 (Mo. banc 1999).

## RULE 29.15 PROCEEDING

He next filed a timely Rule 29.15 motion. In contrast to the evidence at trial, the post-conviction court was presented with a picture of Clayton's early life as one filled with trouble. As a young man, he was known to have a violent, quick temper and had several run-ins with the law. In the 1960s, Clayton got into a physical altercation with a highway patrol officer who stopped his car and, on another occasion, was arrested for assaulting the local high school principal in a restroom at the high school during a basketball game. While in jail for the assault, Clayton was converted to Christianity and became devoted to his new found faith.

The evidence of Clayton's history after his conversion was more consistent with the evidence at trial. He stopped drinking alcohol. He began to attend church regularly, eventually preaching and singing during the services. Clayton became a part-time pastor and traveling evangelist, going to different churches around the area preaching in revivals and performing songs with his wife and children.

More detail was offered regarding the 1972 sawmill accident. A piece of wood apparently broke off the log he was working on and was thrown into his head. The piece became imbedded inside his skull and could only be removed surgically. Although Clayton spent a considerable amount of time recuperating in the hospital after the accident, he did not receive any long-term therapy.

Unable to work in the timber business, Clayton tried other types of work, including working for a short time as a police officer in Purdy, Missouri. Eventually, Clayton quit looking for full time employment. He applied for and received social security disability benefits, although he was still able to do various odd jobs.

Clayton's personal life deteriorated. Although he continued traveling around preaching and singing with his family for awhile, he eventually quit. He started drinking again. His wife left him and they eventually divorced. He was violent and quick-tempered with members of his family, once slapping one of his sisters so hard that it cut her lip and broke a tooth.

The first attorney Clayton contacted after his arrest was Ross Rhoades, who had represented him in previous criminal cases. Rhoades initially recommended that Clayton find someone else to represent him, even though Rhoades had previously tried a capital murder case and numerous other felony cases. Clayton considered two other attorneys, rejecting both of them because he did not trust them, and hired Rhoades.

As previously noted, Rhoades used two different defenses at trial. First, he built off the fact that gunpowder residue was not found on Clayton after he was arrested but was found on Martin Cole. Rhoades used this and other weaknesses in the state's case to "hold the state to its burden" and to argue that reasonable doubt existed as to Clayton's guilt. Second, Rhoades relied on evidence about Clayton's 1972 sawmill accident, the loss of nearly eight percent of his brain, and expert testimony of Clayton's lack of mental capacity to deliberate to argue that Clayton could not be found guilty of first-degree murder. This appeal follows the denial of relief in the Rule 29.15 proceeding.

## STANDARD OF REVIEW

■ The Court will only overturn a trial court's ruling on a post-conviction relief motion if the trial court's findings and conclusions are clearly erroneous. *Rule 29.15(k)*. The presumption that the trial court's rulings are correct can only be

defeated if the appellate court "is left with a definite and firm impression that a mistake has been made." *State v. Link,* 25 S.W.3d 136, 148–49 (Mo. banc 2000).

■ In this case, all of Clayton's claims are based on ineffective assistance of trial counsel. In order to overturn a conviction or a death sentence for ineffective assistance, the defendant must first show that his attorney's conduct fell below an objective standard of reasonableness and second that his attorney's errors prejudiced his case. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The attorney's conduct must be so egregious that it undermines the proper functioning of the adversarial process to such an extent that the original trial cannot be relied on as producing a just result. *Id.* at 686, 104 S.Ct. 2052.

■ The defendant has a heavy burden in proving ineffective assistance. Both parts of the *Strickland* test must be fulfilled; if he fails to prove either one, no relief can be granted. *State v. Kinder,* 942 S.W.2d 313, 335 (Mo. banc 1996). The reviewing court presumes that the trial attorney's conduct was reasonable and was not ineffective. *State v. Stepter,* 794 S.W.2d 649, 657 (Mo. banc 1990). Reasonable choices of trial strategy, no matter how ill fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance. *See Sanders v. State,* 738 S.W.2d 856, 858 (Mo. banc 1987).

Clayton fails to demonstrate that the trial court's findings or conclusions are clearly erroneous. He first argues that his trial attorney was ineffective for pursuing simultaneously both a "reasonable doubt" defense and a diminished capacity defense. Next, he argues that his attorney was ineffective in failing to thoroughly investigate and present the diminished capacity defense alone. Third, Clayton claims that

his attorney was ineffective for failing to have Clayton's competency to stand trial adjudicated, and that Clayton was so incompetent during the trial that he was not able to assist the attorney in conducting his defense. Finally, he argues that his attorney was ineffective for not presenting certain mitigating evidence in the trial's penalty phase. These four claims fail to establish that the trial court clearly erred in finding that the conduct of Clayton's trial attorney did not fall below the objective standard of reasonableness demanded by law.

## PRESENTATION OF TWO THEORIES OF DEFENSE

■■ Trial counsel was not ineffective in arguing that a reasonable doubt of guilt existed and a diminished capacity defense. Missouri courts have long recognized that criminal defendants have the right to present multiple defenses, even if the defenses are somewhat inconsistent. *State v. Wright,* 352 Mo. 66, 175 S.W.2d 866, 872 (1943). In *State v. Lora,* the court held that a defendant could not be prevented from offering evidence that he was "feebleminded," thus lacking the mental capacity to commit the crime charged, even though he was also relying on the defense of alibi. 305 S.W.2d 452, 455–56 (Mo.1957). As the Court noted, a defense of mental incapacity and alibi are not necessarily inconsistent. *Id.* at 455. Proof that an individual does not have the capacity to form intent does not negate an alibi defense. *Id.* The facts underling both defenses can exist simultaneously.

In this case, asserting that a reasonable doubt of guilt exits and that the accused had diminished capacity are not inconsistent, as Clayton alleges. It is not logically inconsistent to argue that the state failed to prove that Clayton was the shooter and

that he did not have the mental capacity necessary to form intent for first-degree murder. Both can be equally true and exist at the same moment in time. While pursuing both defenses in one trial might hurt an attorney's credibility with the jury in some cases, there is no *per se* rule against an attorney arguing both that the state must prove guilt beyond a reasonable doubt and asserting a diminished capacity defense. The decision to use two defenses turns solely on a question of trial strategy.

 Making both arguments in Clayton's case was a reasonable choice. A strategic decision is reasonable if it was made with the same skill and diligence another reasonably competent attorney would use under similar circumstances. *Sanders,* 738 S.W.2d at 858. In this case, Clayton's attorney knew that he did not have a strong case under either theory. Even though there was gunshot residue on Martin Cole's hands, Clayton's attorney knew that Cole had a good alibi for the time of the murder and had no motive to kill the deputy. From his numerous years of felony jury trial experience in the local area, he also knew that juries were very suspicious of "insanity" defenses and hired experts. Finally, the attorney knew of the conflicting evidence about Clayton's mental capacity that would make a diminished capacity defense tough to sell to the jury.

The attorney relied on more than his own hunches and experience in deciding to pursue both defenses. He assembled a mock jury made up people out of the same general community where the case was going to be tried and presented the state's evidence and both defenses to them. Most responded favorably toward the reasonable doubt defense, and the panel members did not report a problem with him presenting both defenses. He also had numerous discussions with two other attorneys about the issue and even discussed the matter with Clayton himself. Under the circumstances, the attorney's decision cannot be characterized as clearly unreasonable.

The authorities Clayton cites from other jurisdictions in support of his argument are not helpful. For example, he argues that in *Ross v. Kemp,* the Supreme Court of Georgia found that the presentation of inconsistent defenses is ineffective assistance. 260 Ga. 312, 393 S.E.2d 244, 245 (1990). That is not quite the holding in *Kemp.* In *Kemp,* the defendant had two different attorneys, one retained by his family and one appointed by the court, that were both actively involved in questioning witnesses and arguing to the jury. *Id.* The attorneys never conferred with each other about strategy prior to trial, they argued inconsistent defenses to the jury, and one of them placed the defendant on the stand without preparing him at all to testify. *Id.* It was all these factors together that resulted in the finding of ineffective assistance of counsel. Obviously, the situation in Clayton's trial was very different.

While it may be unusual for an attorney to probe weaknesses in the state's case giving rise to reasonable doubt and also to assert a diminished capacity defense, it is not unheard of or *per se* unreasonable. In the circumstances of this case, the presentation of both arguments did not fall below the objective standard of reasonableness required by *Strickland.*

### FAILURE TO INVESTIGATE AND PRESENT DIMINISHED CAPACITY

 Clayton's attorney was not ineffective in his investigation and presentation of the diminished capacity defense. It is not ineffective assistance of counsel for an attorney to pursue one reasonable trial strategy to the exclusion of another, even if the latter would also be a reasonable

strategy. *State v. Ferguson*, 20 S.W.3d 485, 508 (Mo. banc 2000). In this case, even though using a diminished capacity defense by itself might have been a reasonable trial strategy, it was also reasonable, as demonstrated above, to argue that a reasonable doubt of guilt existed. The fact that the diminished capacity defense did not get as much emphasis as it might have by itself cannot be an independent basis for an ineffective assistance claim. This was part of the attorney's overall strategic choice, and was not ineffective assistance.

 Clayton also claims that his attorney was ineffective for failing to introduce certain specific items of evidence and for failing to call two particular witnesses in support of the diminished capacity defense. Clayton is incorrect on both counts. First, the selection of witnesses and evidence are matters of trial strategy, virtually unchallengeable in an ineffective assistance claim. *Leisure v. State*, 828 S.W.2d 872, 875 (Mo. banc 1992). By deciding to use both defenses, the attorney also decided not to use all of the witnesses and evidence he might have used had he raised diminished capacity alone.

 Clayton's attorney also had legitimate strategic reasons for not introducing Clayton's school records, Nevada State Hospital records, and Social Security Disability file, as Clayton now claims a reasonable attorney would have done. He argues that these records would have provided the jury with a better picture of his mental capacity and his history of multiple head injuries. From his pre-trial investigation and his own experience with Clayton in the past, the trial attorney knew Clayton's history of head injuries. He knew that while the records might give the jury insight into that history, their introduction also ran the risk of the defense getting mired in a "paper war" with the prosecution, deluging the jury with hundreds of pages of documents and confusing them.

Clayton's attorney wanted to keep the picture he painted for the jury simple; that of a man forever changed by a sawmill accident in 1972. The records Clayton now complains about would have complicated that picture and shown the jury that Clayton was also a violent man with a criminal record even before his accident occurred. Also, some of the evidence cast a cloud of doubt over claims about Clayton's mental incapacity. Thus, the attorney's decision was consistent with his trial strategy and was not ineffective assistance.

 The attorney was not ineffective for failing to call Les Paul, a minister, to testify about Clayton's diminished capacity and religious faith. When the attorney contacted Paul prior to trial about testifying about Clayton's good traits, Paul told him that he "couldn't help him." An attorney is not ineffective for failing to further investigate or call a witness to testify who is unwilling to do so and who cannot be counted on to give testimony favorable to his client. *State v. Hall*, 982 S.W.2d 675, 686 (Mo. banc 1998). Here, Paul's statement gave the attorney reason to believe that he did not want to testify and that he might offer testimony harmful to Clayton's case.

The fact that Paul now claims he only told Clayton's attorney he could not help him because he distrusted the attorney is immaterial. At the time the attorney made the decision not to call him, he was acting reasonably based on Paul's statements to him. An attorney is not required to be omniscient and see the true reasons why a witness does not want to talk to him or testify.

 Similarly, Clayton's attorney was not ineffective for failing to call Caro-

lyn Dorsey. While Dorsey could have testified about the change in Clayton's personality after the sawmill accident, the attorney presented other witness who testified about the same thing. An attorney is not ineffective for failing to offer cumulative testimony. *Skillicorn v. State*, 22 S.W.3d 678, 683 (Mo. banc 2000). Also, Dorsey would have provided the prosecution on cross-examination with the opportunity to show that Clayton had a violent temper even before his accident, undercutting Clayton's diminished capacity defense. It is not ineffective assistance for an attorney not to call a witness that might undermine the whole theory of trial. *See State v. Richardson*, 923 S.W.2d 301, 328 (Mo. banc 1996).

## FAILURE TO ADJUDICATE CLAYTON'S COMPETENCY

 Clayton's attorney was not ineffective for failing to adjudicate his competency. Counsel has no duty to investigate a client's mental condition where the client appears to have the present ability to consult rationally with the attorney and understand the court proceedings. *Richardson*, 923 S.W.2d at 328. In this case, Clayton's attorney had extensive prior involvement with him before this case ever arose. From the fact that Clayton was able to intelligently discuss his legal options with his attorney, and even carry on correspondence with him about the case, the attorney could reasonably conclude that he was competent to stand trial.

 Clayton has also failed to demonstrate that he was actually incompetent during his trial. The trial court did not find Dr. Daniel Foster, the only expert to testify that Clayton was incompetent, credible. Trial courts have a superior opportunity to judge the credibility of witnesses, and this Court will defer to a trial court's credibility determination even on an expert witness. *State v. Simmons*, 955 S.W.2d 752, 773 (Mo. banc 1997). In this case, Dr. Foster's determination is especially questionable because even though he said Clayton was incompetent at the time of his trial, he admitted that Clayton understood the role of the prosecutor, the judge, the juror, and even his own attorney in the process. He further stated that Clayton knew what he was charged with, that he was facing the death penalty, and that he was able to discuss his various options with his attorney. Dr. Foster's testimony is further undermined by the fact he examined Clayton for the first time years after the original trial occurred. The judge, who had also presided during Clayton's trial, had more than a reasonable basis to concluded that Dr. Foster's testimony was not credible and that Clayton was competent at the time of his trial.

## FAILURE TO PRESENT SPECIFIC MITIGATING WITNESSES

 Clayton argues that his trial counsel should have called Carolyn Dorsey, Arnold Evans, Les Paul, Norma Mitchell, and Delores Williams to testify during the penalty phase of his trial. As has been noted before, the selection of particular witnesses in general is a matter of trial strategy and is virtually unchangeable on an ineffective assistance claim. *Leisure*, 828 S.W.2d at 875. In this case, none of the five witnesses Clayton mentions would have added anything significant to his case during penalty phase.

 Much of the testimony presented by these witnesses would have been needlessly cumulative. Under Missouri law, an attorney is not ineffective for failing to put on cumulative evidence. *Skillicorn*, 22 S.W.3d at 683. Clayton argues Evans, Dorsey, Paul, Williams, and Mitchell all should have been called to testify about his background, his religious faith, his reli-

gious ministry to others, or the change in his personality after the accident. During the original trial, Clayton's two brothers and the chaplain from the county jail gave similar testimony, although sometimes they relied on different incidents. Much of the information the witness would have provided was on Clayton's background. There is no requirement that an attorney present any background information on his client during a capital trial's penalty phase. *Richardson*, 923 S.W.2d at 329.

Their testimony may well have undercut the defense's argument that Clayton's brain injury and ensuing mental incapacity were mitigating factors. For example, Dorsey would have testified about Clayton's violent temper as a young man and would have helped the prosecution argue that Clayton's brain injury was not the only reason behind his actions. Paul would have also testified about how Clayton was still able to do complex mental tasks after his injury, like preaching in revivals. Because the testimony of these five witnesses would have added little to Clayton's case and in some ways may have harmed it, his attorney was not ineffective for failing to call them.

## CONCLUSION

Clayton has not demonstrated that his attorney's conduct fell below the objective standard of reasonableness demanded of criminal practitioners. In this regard, the finding and conclusions of the post-conviction court are not clearly erroneous. The judgment is affirmed.

All concur.