Roger YOKSH, Appellant,

v.

STATE of Missouri, Respondent.

No. WD 59806.

Missouri Court of Appeals,
Western District.

May 31, 2002.

James F. Speck, Jonathan L. Laurans, Kansas City, MO, for Appellant.

Philip M. Koppe, Asst. Attorney General, Kansas City, MO, for Respondent.

Before ULRICH, P.J.,
BRECKENRIDGE and HARDWICK JJ.

LISA WHITE HARDWICK, Judge.

Roger Yoksh was convicted of second-degree murder and sentenced to thirty years imprisonment. His conviction was affirmed on appeal. He now appeals the denial of his Rule 29.15 post-conviction relief motion, asserting two grounds of error based on ineffective assistance of

counsel: 1) his trial counsel pursued a defense that was inconsistent with medical testimony and failed to retain an expert whose testimony could have supported a more viable defense; and 2) his trial counsel failed to investigate and strike a juror who was potentially prejudiced against him. We affirm the motion court's judgment.

### Factual and Procedural Background

We draw principally from the fact statement in the direct appeal of this matter. *State v. Yoksh,* 989 S.W.2d 227 (Mo.App. W.D.1999). On August 22, 1996, sixteen-month old Tristan Chance was at a daycare located in the home of the Appellant, Roger Yoksh, and his wife, Lori Yoksh. Tristan had been in the daily care of the Yokshs for almost 4 months along with other children. Mrs. Yoksh cared for the children until about 4:00 p.m., when she left for another job outside the home and left the children under Mr. Yoksh's supervision.

Tristan's mother, Lauri Chance, arrived at the Yoksh home around 5:42 p.m. that afternoon to pick up her son. She observed Mr. Yoksh sitting on the couch where Tristan appeared to be sleeping. She noticed that Tristan's face was "gray" in color and he was breathing in "short, low, gaspy breaths." He did not respond or wake up when she called his name. She lifted Tristan and found that he was limp, with his eyes and mouth partially open.

At Mrs. Chance's request, Mr. Yoksh called his wife to see if anything had been wrong with Tristan earlier in the day. Mr. Yoksh then called 911. When the police and paramedics arrived at 5:47 p.m., Tristan was unresponsive, his breathing was labored, and no pulse could be detected. In route to the hospital, paramedics were unable to establish an airway to assist Tristan's breathing. He was rigid, unresponsive, experiencing some seizure activity, and his right pupil was dilated while the left was constricted. The paramedics suspected head trauma.

Tristan arrived at Children's Mercy Hospital at 6:23 p.m. He was pale, actively seizing, and had a rapid but regular heartbeat. The soft spot on his head appeared to bulge, suggesting increased pressure within the skull. Tristan's condition worsened over time, and he died four days later, on August 26,1996.

An autopsy revealed two recent bruises to the back of Tristan's head. There were fractures along the lamboidal sutures of the skull and hemorrhages to the back and left side of his head. A "gaping fracture" was evident along the left side of his head, a blood clot over the surface of the brain on the right side, and the brain was markedly swollen and soft. There were also hemorrhages in Tristan's retinas, which the Medical Examiner testified were typically caused when a baby is shaken violently or by a severe impact to the head.

After police investigation, Mr. Yoksh was charged with first-degree murder for Tristan's death. A jury trial was held June 2—10, 1997. The State presented testimony from Tristan's grandfather that the child was in good health when the grandfather dropped him off at the Yoksh's daycare on August 22, 1996. Mrs. Yoksh testified that Tristan was fine when she left him in Mr. Yoksh's care around 4:00 p.m.

The State also presented testimony from children who were at the day care on that afternoon. They saw Tristan laughing and talking about 20 minutes after Mrs. Yoksh departed around 4:00 p.m. They later saw him being pushed by another small child into a doorjamb. One child saw Tristan fall off the couch and hit his head against the coffee table.

At one point, when Tristan had been crying, the children saw Mr. Yoksh take him back into the bedroom where Tristan's crib was located. Later, around 4:50 or 5:00 p.m. they saw Tristan sitting on the couch with Mr. Yoksh. Tristan looked "kind of tired" and made a groaning sound "like he was humming [himself] to sleep." His eyes rolled and blinked, and he repeatedly made sucking or hissing noises while trying to breathe.

The Medical Examiner testified that Tristan's extensive injuries were most likely non-accidental, and that he could not have been walking or talking after the injuries occurred. Several other medical experts confirmed these conclusions and testified for the State that Tristan's injuries did not likely result from a fall such as those described by witnesses who reported Tristan being pushed into a door jamb or falling from a couch.

Mr. Yoksh testified at trial and denied any responsibility for Tristan's injuries. The defense presented a neurologist's testimony that a single, "very severe" blow could have accounted for Tristan's injuries. On cross-examination, the neurologist said it was "possible" but "not likely" that the child could have suffered the skull fracture from a short vertical fall off the couch onto the coffee table. He indicated the retinal hemorrhaging was probably caused from Tristan being shaken. He said it was "possible" but "not likely" that a child who suffered a serious skull fracture and retinal hemorrhaging could be walking around for some period of time following those injuries.

The jury found Mr. Yoksh guilty of second-degree murder. He was sentenced to thirty years in prison. His conviction was affirmed on appeal. *Yoksh*, 989 S.W.2d 227.

Mr. Yoksh filed a Rule 29.15 Motion to Vacate, Set Aside or Correct the Judgment, alleging ineffective assistance of his trial counsel. After an evidentiary hearing, the motion court denied post-conviction relief. Mr. Yoksh appeals.

## Standard of Review

■ Our review of the denial of post-conviction relief is limited to a determination of whether the motion court's findings of fact and conclusions of law are "clearly erroneous." *Rousan v. State*, 48 S.W.3d 576, 581 (Mo.banc 2001). Such findings and conclusions are "clearly erroneous" only if after a review of the entire record, we are left with the definite and firm impression that a mistake has been made. *Id.*

## Effectiveness of Counsel in Presenting A Viable Defense

■ Appellant contends his counsel was ineffective in advancing a defense that attempted to show Tristan's fatal injuries occurred accidentally while he was in Mr. Yoksh's care. Defense counsel presented a medical expert who was equivocal in his testimony that Tristan's injuries might have been caused by hitting his head on the doorjamb or on the coffee table after falling off the couch. Mr. Yoksh argues his counsel failed to retain a pediatric neurologist who could have testified about a uniquely pediatric condition known as "delayed deterioration" or the "talk and die" syndrome. Such testimony would have shown Tristan's injuries were likely sustained much earlier in the day, prior to the time he was under Mr. Yoksh's supervision.

■ To set aside a conviction based upon ineffective assistance of counsel, Mr. Yoksh must show that his attorney's conduct fell below an objective standard of reasonableness and that these errors prejudiced his case. *Rousan*, 48 S.W.3d at

581–82, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Given his allegation that counsel failed to retain the proper experts, Mr. Yoksh has the burden of proving that such an expert was available and could have been located at the time of trial, and that the expert's testimony would have benefited his defense. *State v. Johnson*, 968 S.W.2d 686, 696–97 (Mo.banc 1998). Prejudice arises when, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *Morrow v. State*, 21 S.W.3d 819, 823 (Mo.banc 2000).

At the Rule 29.15 evidentiary hearing, Mr. Yoksh presented Dr. Gerald Tremblay, an assistant professor of pediatric neurology at the University of Missouri–Kansas City School of Medicine. Dr. Tremblay testified about the forensic use of CAT scans to identify "delayed deterioration" or the "talk and die" syndrome. The condition arises when a child suffers a head injury and may seem perfectly normal for several hours but becomes ill twelve to twenty-four hours later and subsequently dies. This pediatric condition occurs because the head trauma can cause progressive swelling (edema) of the child's brain and may not immediately affect the child's appearance or conduct. In such cases, the CAT scan would not reveal the edema until at least twelve hours after the injury occurred. Dr. Tremblay estimated that, in his experience, ten to twenty percent of the children treated for head injuries suffered from delayed deterioration. He cited a 1997 Canadian hospital study, which reported that fifty percent of the pediatric head trauma victims died although they were conscious and talking when they arrived at the hospital.

Dr. Tremblay reviewed the CAT scans that were taken of Tristan at 7:32 p.m. on August 22, 1996. Based on the extent of edema, he testified that Tristan's head trauma could have occurred twelve to twenty-four hours before the CAT scan if the child suffered from delayed deterioration syndrome. Thus, Tristan might have been injured as early as 7:30 a.m. that morning, long before he was in Mr. Yoksh's care.

Mr. Yoksh argues Dr. Tremblay's testimony was corroborated by three witnesses at trial: Dr. Jeffrey Foster, pediatric neurologist; Dr. Ilene Walsh, pediatrician; and Dr. Gerhart Cibis, pediatric ophthalmologist. All three doctors supported the concept that the physiology and diagnostic process for children is different than for adults.

Trial counsel, William O'Sullivan, also testified at the Rule 29.15 hearing. Mr. O'Sullivan became involved in the case on the date Tristan's injuries occurred, when he was contacted by a relative of Mr. Yoksh. Once retained, Mr. O'Sullivan "put feelers out through everybody possible" to locate medical experts who could assist him in preparing a defense. He interviewed the medical practitioners identified by the State and conferred with several other physicians located through his investigation. None of the medical practitioners indicated they did not have the expertise to testify regarding Tristan's condition. Nor did they suggest he consult with a pediatric neurologist.

During the pretrial discovery process, Mr. O'Sullivan received a report from a radiologist, Dr. Seidel, stating that Tristan's head injury would not have shown up on a CAT scan for a minimum of four to six hours after the injury occurred. Since the statement conflicted with all of the other evidence and opinions of other doctors he asked to review the case, Mr. O'Sullivan did not consider Dr. Seidel's report reliable.

Mr. O'Sullivan retained Dr. Bernard Abrams, a neurologist, to testify for the defense at trial. In the course of trial preparation with Dr. Abrams, Mr. O'Sullivan reviewed more than 150 medical articles that were "as up-to-date as [they] could possibly find" on the subject of head injuries. The 1997 Canadian hospital study, referenced in Dr. Tremblay's testimony, was not discussed in any of those articles. Mr. O'Sullivan testified that the medical journal report of the Canadian study was not available at the time of trial in June 1997. Since none of the physicians he consulted with mentioned the delayed deterioration syndrome, Mr. O'Sullivan testified to his belief that he could not have presented a defense on the basis of this unique pediatric condition, because it was virtually unknown to area medical experts at the time of trial.

Given the lack of credible and substantial evidence to show that Tristan was injured prior to Mrs. Yoksh leaving the daycare around 4:00 p.m., Mr. O'Sullivan defended the case based on the children's testimony that Tristan fell into a door frame or off the couch and hit his head on the coffee table. This defense accepted the State's theory that Tristan was injured while in Mr. Yoksh's care—but attempted to create reasonable doubt on the first-degree murder charge. While Mr. O'Sullivan was disappointed that Dr. Abrams testimony wasn't stronger with regard to the possibility (but not likelihood) the injuries were caused by Tristan's head hitting the coffee table after he fell from the couch, he still believed Dr. Abrams was the best available expert, and that his testimony would cause the jury to doubt that Mr. Yoksh was guilty of murder.

In attempting to prove ineffectiveness, Mr. Yoksh faced a strong presumption that his counsel made all significant decisions in the exercise of reasonable professional judgment. *White v. State*, 939 S.W.2d 887, 895 (Mo. banc 1997). "Reasonable choices of trial strategy, no matter how ill fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance of counsel." *Clayton v. State*, 63 S.W.3d 201, 206 (Mo. banc 2001).

Based on the evidence available at the time of trial, Mr. O'Sullivan made a reasonable strategic decision to pursue a defense that sought to prove Tristan was accidentally injured while in Mr. Yoksh's care. He diligently interviewed the State's medical experts and conducted his own research and investigation on the subject of head trauma. That investigation led him to identify a defense expert, Dr. Abrams, who was knowledgeable of the medical literature and could testify about the forensic significance of Tristan's injuries. Mr. O'Sullivan had no reason to believe a pediatric neurologist was necessary, given the information available to him at that time.

Mr. Yoksh has failed to meet his burden of proving that counsel could have located an expert to testify about the delayed deterioration syndrome at his June 1997 trial. Dr. Tremblay was not practicing medicine at that time. The results of the Canadian hospital study Dr. Tremblay referenced were not published until late 1997 or in 1998, well after the trial. No other experts or articles have been identified as a possible source of information available to Mr. O'Sullivan in the months of trial preparation leading up to June 1997.

Strategic choices, made after a thorough investigation of the law and facts relevant to plausible options, are virtually unchallengeable, and a "heavy measure of deference" must be given to counsel's decisions regarding the nature and extent of any investigation and the theories developed

therefrom. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. The record supports the motion court's finding that Mr. O'Sullivan's performance was within the range of skill and diligence expected of a reasonably competent attorney. Point I is denied.

## Effectiveness of Counsel in Jury Selection

In his second point, Mr. Yoksh claims his trial counsel was prejudicially ineffective in failing to investigate the working relationship between a venireperson and Mrs. Chance, Tristan's mother. The venireperson, Lawrence Spillman, was employed by a collections agency that operated as an independent division of Citicorp. Mrs. Chance was employed in the bankruptcy department of Citicorp, where Mr. Spillman's wife also worked. Although the juror questionnaire revealed Mr. Spillman's employment, defense counsel did not *voir dire* or investigate any possible connections Mr. Spillman might have with Mrs. Chance. Mr. Spillman was selected for the jury and ultimately served as jury foreman. On appeal, Mr. Yoksh contends his counsel failed to challenge venireperson Spillman as a potentially biased juror and failed to pursue a new trial motion once counsel learned that Mr. Spillman may have concealed his prior knowledge about Tristan's death.

The *Strickland* standard is also applicable to this claim of counsel ineffectiveness. Movant must show that trial counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances, and that counsel's deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. Trial counsel's decision

to remove a juror is a matter of reasonable trial strategy. *Tripp v. State,* 958 S.W.2d 108, 111 (Mo.App. S.D.1998). Mr. Yoksh faces a strong presumption that the challenged action constituted sound trial strategy. *Id.* His counsel will not be judged constitutionally ineffective even if, after a review of the record, it appears his decisions may have represented an error in judgment. *Id.*

Mr. Yoksh presented testimony from several Citicorp employees at the Rule 29.15 hearing. The employees recalled that Tristan's death and the Yoksh case were so widely discussed at Citicorp that management distributed a memo forbidding further workplace discussion of the matter. Some employees remembered seeing Mr. Spillman in the bankruptcy department when he met Mrs. Spillman for lunch; one employee remembered the matter being discussed in Mr. Spillman's presence. Another employee testified Mrs. Spillman was present during workplace conversations about the case and sent a sympathy card to Mrs. Chance, whom she worked nearby in the bankruptcy department.

The State called Mr. Spillman and three employees who worked with him in the Citicorp collections agency. None of the three employees recalled any conversations about Tristan's death in the workplace. One employee had no recollection of any management directive to cease discussion of the matter.

Mr. Spillman testified he did not know Mrs. Chance prior to trial, and that he did not know Mrs. Chance worked at Citicorp until after the trial.[1] He explained that Citicorp's 1,500 local employees are officed in two separate buildings. He was em-

---

1. Mrs. Chance corroborated this after trial when she told police she had no discussions with Mr. Spillman's wife regarding the Yoksh case. While she had seen Mr. Spillman from a distance, she did not know who he was until a co-worker attending the trial pointed him out to her. She met Mr. Spillman for the first time after the trial was over.

ployed in a division of Citicorp which, as a collections agency, purposely restricted his contact with other employees. The collections agency, known as R.S.I., operated as an independent division of Citicorp. Mrs. Spillman worked in the bankruptcy department in a separate building from R.S.I. While Mr. Spillman frequently met her for lunch, he generally went in the bankruptcy department only briefly to let Mrs. Spillman know he was ready and then waited for her in the hallway due to the conflicting nature of his job responsibilities.

Mr. Spillman denied having any knowledge of the Yoksh case prior to trial. He never discussed any aspect of the case with his wife prior to reporting for jury duty. He thought his wife might have mentioned, immediately after the death occurred, that the baby of one of her coworkers had been killed, but he denied that comment had any impact on him. When he reported for jury duty and saw the "Yoksh" name on the docket, it meant nothing to him. When the jury panel was questioned during the selection process, he did not recognize the names of any of the parties. If he had, he testified he would have asked to be excused, because jury service in such a case was not something he wanted to do.

Defense counsel O'Sullivan testified at the evidentiary hearing that he would typically move to strike any venire person who might be biased against his client. However, in the Yoksh case he had received investigative information that employees at Citicorp disliked Mrs. Chance and viewed her as "not very credible" and "not a very good mother." Mr. O'Sullivan was also aware that Mr. Yoksh's sister, Tina Yoksh, worked at Citicorp and was well-liked by company employees. Mr. O'Sullivan therefore believed "the defendant was better off with the Citicorp people [serving on the jury] than what would be the [Mother]

and the child in this case, because a lot of people out there knew the victim's mother was strange."

Mr. O'Sullivan testified that, following trial, he received a letter from a man whose wife worked at Citicorp at the time of the Tristan's death. The letter indicated the jury foreman, Mr. Spillman, worked at Citicorp where information about "the case had spread through [the company] like wildfire." Based on this initial information, Mr. O'Sullivan moved for a new trial because he was concerned that a juror may have concealed prior knowledge of circumstances surrounding Tristan's death.

Mr. O'Sullivan hired an investigator to check out the allegations in the letter. The investigator interviewed Mr. Spillman, whom he found to be cooperative, "honest and forthright." Mr. Spillman denied the allegations in the letter and said he did not know Mrs. Chance prior to trial. The investigator also interviewed the author of the letter (sent to Mr. O'Sullivan) and found him less credible than juror Spillman. In light of the investigator's report, Mr. O'Sullivan decided not to pursue the new trial motion allegation that juror Spillman had concealed his prior knowledge of the case.

Based on the evidence presented at the Rule 29.15 hearing, Mr. Yoksh failed to overcome the presumption that his counsel's conduct with regard to juror Spillman was a matter of reasonable trial strategy. Mr. O'Sullivan felt it was in his client's best interest not to question Mr. Spillman about his Citicorp employment because he believed Citicorp employees would be more favorable to the defense than prosecution. In fact, neither the State nor defense inquired about the Citicorp connections during *voir dire*, as each side could reasonably believe a Citicorp employee might be favorable to its position.

Mr. O'Sullivan also carefully evaluated his client's best interest after learning from an investigator that juror Spillman most likely did not have prior knowledge of the case facts and was not biased against Mr. Yoksh. The motion court properly concluded that defense counsel rendered adequate assistance and exercised sound professional judgment in jury selection and the post-trial phase.

The evidence further indicates no prejudice occurred as a result of Mr. O'Sullivan's failure to *voir dire* on the subject of Citicorp employment or raise the issue of juror concealment in post-trial motions. Appellant's prejudice argument is solely based on his contention that juror Spillman was biased and tainted the entire jury by virtue of his influence as foreman. Mr. Spillman denied having any prior knowledge of the Yoksh case or familiarity with Mrs. Chance. The motion court found his testimony credible, and we must defer to its superior opportunity to evaluate the evidence. Mr. Yoksh failed to prove that Mr. Spillman's impartiality was compromised, or that his presence on a jury of twelve persons undermines confidence in the verdict. Point II is denied.

The judgment of the motion court is affirmed.

All concur.