Torrey L. **TROTTER**, Movant–Appellant,

v.

**STATE** of Missouri, Respondent–Respondent.

No. SD 29894.

Missouri Court of Appeals, Southern District, Division One.

May 10, 2010.

Ellen H. Flottman, Columbia, MO, for Appellant.

Chris Koster, Atty. Gen., Terrence M. Messonnier, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Presiding Judge.

Following a jury trial, Torrey Trotter (Trotter) was convicted of assault in the first degree, burglary in the first degree and armed criminal action. *See* §§ 565.050, 569.160 and 571.015.[1] His convictions were affirmed on direct appeal to this Court in *State v. Trotter*, 241 S.W.3d 860, 864 (Mo.App.2007).

Thereafter, Trotter filed a timely pro se motion for post-conviction relief pursuant to Rule 29.15. Appointed counsel filed an amended motion which alleged, *inter alia,* that Trotter's trial counsel was ineffective because he "failed to introduce clear and convincing evidence that [Trotter] was right-handed." After conducting an evidentiary hearing, the motion court denied relief. This appeal followed.

Our review of the denial of a Rule 29.15 motion is limited to a determination of whether the findings and conclusions of the motion court are "clearly erroneous." Rule 29.15(k); *Clayton v. State,* 63 S.W.3d 201, 205 (Mo. banc 2001). Findings of fact and conclusions of law are clearly erroneous only when, after reviewing the entire record, this Court is left with the definite and firm impression that a mistake has been made. *Clayton,* 63 S.W.3d at 205–06. "Just as in a direct appeal, we must view the facts in the light most favorable to the verdict." *Coday v. State,* 179 S.W.3d 343, 346 (Mo.App.2005). This Court accepts as true all evidence and inferences favorable to the verdict; all contrary evidence and inferences are disregarded. *Smith v. State,* 207 S.W.3d 228, 230 (Mo.App.2006).

The relevant events occurred in Springfield, Missouri in March 2004. Trotter had children with a woman named Holly Jaskeiwicz (Jaskeiwicz). She was friends with a man named John Stafford (Stafford). Jaskeiwicz accompanied Stafford while he rented a car so they could drive to Chicago to pick up Jaskeiwicz's children. After renting the car, Stafford and Jaskeiwicz returned to Stafford's home. Jaskeiwicz then drove the rental car to her apartment. She was to return when she was ready to leave for Chicago.

Some time later, Jaskeiwicz called Stafford and said that she had to get some papers and would be on her way. Shortly thereafter, Stafford received another call from Jaskeiwicz. She stated that Trotter was at her apartment, sitting in the rental car. After learning of Trotter's presence in the rental car, Stafford decided to go to

---

1. All references to statutes are to RSMo (2000). All references to rules are to Missouri Court Rules (2009).

Jaskeiwicz's apartment. When Stafford arrived, Trotter was in the driver's seat of the rental car. Stafford asked Trotter to exit the rental car. He complied, but in the process he "slammed" the door against Stafford. This led both men to throw punches at one another. Stafford testified that he "got the better" of Trotter, hitting him "several times." Stafford eventually obtained the keys to the rental car and called his brother to drive it back to Stafford's house.

The police arrived at Jaskeiwicz's apartment after the fight had concluded. Trotter's eye was swollen shut, but he told police that he did not want to press charges "[b]ecause [he] didn't want no more to do with it."

Trotter went to the home of a friend, Donnell Hubbard (Hubbard). Trotter's mother, Sheryl, arrived later at Hubbard's home after she received a telephone call that Trotter had been in a fight. Sheryl suggested that they go to Stafford's house to "talk to him." Sheryl drove Trotter, Hubbard and another person to Stafford's home in her van.

Three men were present in Stafford's home: Stafford; Stafford's brother, Billy; and a friend named Zack Tolliver (Tolliver). Stafford was in the kitchen, talking and drinking tea with Tolliver. Billy was in his bedroom. Stafford testified that Tolliver began hollering, "[t]hey shooting." Stafford then heard "popping sounds" and heard voices threatening to kill him. Stafford realized that the voices belonged to Trotter and Hubbard. According to Stafford, "Hubbard was in the living room; Trotter was in the kitchen trying to shoot me." Stafford testified that both Trotter and Hubbard had guns and were firing them.

Billy testified that he heard three or four gunshots, so he grabbed his gun from under his mattress. He saw two individu-als with guns and began shooting at them. When Billy began firing, the two individuals ran out of the house. One of Billy's bullets struck Trotter in the right arm.

Quinn Michael Martin, Stafford's neighbor, testified that he saw two men exit Stafford's house. The first man ran directly to a white mini-van. The second man "was running across the street, and he had a pistol in his hand, was firing."

Dr. Thomas Kelso treated Trotter when he arrived at the emergency room after he was shot. Trotter suffered extensive bone damage as a result of his injury. Dr. Kelso testified that Trotter "would probably drop whatever he was holding in his hand." Dr. Kelso explained that "he wouldn't be able to flex his elbow and hold anything in this position very well because the bone was shattered above the elbow joint." Despite this injury, however, Dr. Kelso also testified that Trotter would have been able to pick up a weapon with his left hand.

Trotter testified on his own behalf at trial. According to Trotter, both he and Hubbard were waved into the house by an "older gentleman sitting at the table in the dining room area." According to Trotter, once they were inside the house, Hubbard pulled out a gun. Trotter claimed that he did not know Hubbard had a gun until that point. Trotter heard the gun go off, and at some point, he was shot. Trotter testified, "I grabbed my arm, and I turned around and left out of the house." Sheryl also was called as a witness by the defense. She testified that, "[a]s far as I know [Trotter's] right-handed." The jury instructions on the assault and armed criminal action offenses authorized the jurors to return a guilty verdict on an accomplice liability theory, even if Trotter did not himself use a firearm during the fracas.

The motion court conducted an evidentiary hearing on the amended Rule 29.15 motion. Trotter's defense attorneys, Shawn Markin (Markin) and Chris Hatley (Hatley), both testified. According to Markin and Hatley, Trotter's theories of defense were: (1) Hubbard and Trotter were attacked by the occupants of Stafford's house; or (2) alternatively, Hubbard had a weapon and fired it, but Trotter was not armed. Markin wanted to show that Trotter was right-handed. Considered in conjunction with Dr. Kelso's testimony, it was hoped this evidence would tend to refute Stafford's testimony that Trotter was holding a gun when Stafford said he was. Markin presented testimony from Sheryl that Trotter was right-handed. Trotter also testified at the evidentiary hearing. According to him, he is right-handed and would have so testified if he had been asked that question at trial. One aspect of Trotter's amended motion claimed trial counsel was ineffective because they "failed to introduce clear and convincing evidence that [Trotter] was right-handed." With respect to that claim, the trial court decided that Trotter failed to meet his burden of proving there was a reasonable probability that the outcome of the trial would have been different but for trial counsel's actions:

> [Sheryl's] testimony stated that her son was right-handed. Thus, the jury had before it evidence that [Trotter] was right-handed. Again, failure to present cumulative evidence does not constitute ineffective assistance of counsel. Additionally, regardless of whether evidence was presented on whether [Trotter] was right-handed or left-handed, Dr. Kelso admitted on cross-examination that even with [Trotter's] injury to his right arm that [Trotter] could have picked up the weapon with his left hand.

(Citation omitted.) Moreover, the motion court also concluded that Trotter could have been found guilty as an accomplice without personally firing a weapon. Therefore, the motion court denied relief.

On appeal, Trotter bears the burden of proving, by a preponderance of the evidence, that he received ineffective assistance of counsel. Rule 29.15(i). To establish ineffective assistance of counsel, Trotter must show that: (1) counsel's performance did not conform to the degree of skill, care and diligence of a reasonably competent attorney; and (2) counsel's poor performance prejudiced the defense. *State v. Hall*, 982 S.W.2d 675, 680 (Mo. banc 1998); *see Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Trotter must prove each portion of this two-pronged performance and prejudice test in order to prevail on his ineffective assistance of counsel claim. *Sanders v. State*, 738 S.W.2d 856, 857 (Mo. banc 1987). To satisfy the first prong, a movant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. A movant can do this by pinpointing specific acts or omissions of counsel that resulted from unreasonable professional judgment, but the reviewing court must find these acts to be "outside the wide range of professionally competent assistance" for the movant to be successful. *Id.* at 690, 104 S.Ct. 2052. Trotter bears the heavy burden of overcoming the trial court's presumption that trial counsel's conduct was reasonable and effective. *Clayton v. State*, 63 S.W.3d 201, 206 (Mo. banc 2001). The second prong of the *Strickland* test is met when a movant shows that his attorney's errors affected the judgment. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. A movant can prove that the judgment was affected when there is a "reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

■ In Trotter's sole point on appeal, he contends the motion court clearly erred in ruling that trial counsel were not ineffective, even though they failed to ask Trotter at trial whether he was right-handed. He argues that, if he had been asked this single question, there is a reasonable probability that the outcome of the trial would have been different. As support for this argument, Trotter relies upon *Coleman v. State,* 256 S.W.3d 151 (Mo.App. 2008). After examining *Coleman,* we conclude that it provides no support to Trotter.

In *Coleman,* Ms. Hood was a neighbor of the Stanfills. In December 2003, she saw a man kick in the door of the Stanfills' house and enter it. *Id.* at 152. A few minutes later, Ms. Hood saw another man enter the house and then exit with wrapped Christmas presents in his hands, which he loaded into an SUV. A third man was inside the SUV. While the first two men were still inside the Stanfills' home, the SUV began driving away. Ms. Hood saw one of the men inside the home exit from the back and run into the neighborhood. An approaching police car began following the SUV by car, and another officer followed the runner on foot. Officer Dull, an off-duty police officer who lived behind the Stanfills' house, responded after hearing a dispatch on the radio. As Officer Dull walked to the front of the Stanfills' home, he noticed Coleman standing on the corner of the yard about 20–25 feet from the front porch. Officer Dull told Coleman to stay where he was, and "Coleman replied that he could not run." *Id.* at 153. At trial, Coleman's counsel failed to present available medical evidence

that Coleman had a preexisting foot injury and was wearing an air brace on his ankle at the time of the burglary. *Id.* at 156–57. Coleman was convicted of burglary in the second degree. *Id.* at 154–55. His amended Rule 29.15 motion alleged, *inter alia,* that trial counsel was ineffective because she had failed to present evidence about Coleman's preexisting foot injury. *Id.* at 154. The motion court denied relief on that ground. *Id.* The western district of this Court reversed because the jurors could well have inferred that: (1) Coleman was the one who kicked in the Stanfills' door; (2) he injured himself in the process; and (3) that is why he said he "could not run" when confronted by Officer Dull. *Id.* at 157. Trial counsel's failure to anticipate this reasonable inference and present evidence to negate it rendered her ineffective, to Coleman's prejudice. *Id.* at 157–58. The case at bar is distinguishable from *Coleman* for at least three reasons.

First, it is clear that Coleman's injury had occurred before the burglary took place, and evidence concerning that injury could have helped the jury exclude him as the person who kicked in the door or ran away from the Stanfills' house. Since Coleman obviously was not the man in the SUV either, there was a reasonable probability that the medical evidence would have made a difference in the outcome. Here, the record demonstrates that Trotter was not injured at all until he was shot by Billy. Prior to that time, Trotter had no injury that would have prevented him from holding or shooting a gun with his right hand. The testimony of both Tolliver and Stafford would support a finding by the jury that Trotter was armed and fired a gun inside Stafford's house. No gun, however, was found in the house. Trotter argues that this fact, coupled with Dr. Kelso's testimony, proves that Trotter would have dropped his gun inside the

house if he had been armed. The record does not support that argument. As Dr. Kelso testified, nothing about the injury to Trotter's right arm would have prevented him from picking up a weapon with his left hand after being shot by Billy.

█ Second, trial counsel in *Coleman* did not present any evidence about the defendant's prior foot injury and the brace on his ankle. *Coleman*, 256 S.W.3d at 157. Here, trial counsel presented evidence from Trotter's own mother that he was right-handed. That evidence was not challenged in any way by the prosecution. "Failing to present cumulative evidence is not ineffective assistance of counsel." *State v. Johnston*, 957 S.W.2d 734, 755 (Mo. banc 1997).

Third, the motion court correctly determined that Trotter could have been found guilty of all three offenses on an accomplice liability theory, even if he personally did not fire a weapon. Trial counsel's alleged failure to present evidence about whether Trotter was right-handed would have had no bearing on this accomplice liability issue.

After a thorough review of the record, we do not have a definite and firm impression that the motion court erred in denying Trotter's request for post-conviction relief. Accordingly, the motion court's findings of fact and conclusions of law are not clearly erroneous. *Clayton v. State*, 63 S.W.3d 201, 206 (Mo. banc 2001); *see* Rule 29.15(k). Point denied.

The motion court's order denying Trotter's amended Rule 29.15 motion is affirmed.

BARNEY and BURRELL, JJ., Concur.